DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellants, Jennifer P. ("Mother") and David M. ("Father"), have appealed from the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed their three children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 {¶ 2} Mother and Father are the unmarried parents of three children: J.P.-M., born August 29, 2002; D.P.-M., born January 12, 2004; and X.P.-M., born
May 14, 2005. All three of the children were born prematurely and each has *Page 2 
special medical needs. J.P.-M. has hydrocephalus and had a shunt inserted in his head, D.P.-M. requires a breathing monitor, and X.P.-M. has problems with apnea and reflux.
 {¶ 3} CSB had been involved with the family on a voluntary basis since March 2004, based upon allegations of excessive fighting in the home and chronically poor living conditions. In addition, there was concern about a young cousin who also lived in the home because he had been coming to school late, dirty, and hungry.
 {¶ 4} CSB caseworker, Bernadette Jablonski, worked with the family throughout the voluntary case plan as well as during the court-ordered case plan. She testified that, initially, she had hoped to help the parents develop some structure and routine in the home, learn and demonstrate consistent parenting skills, and meet the children's medical needs on a consistent basis. However, Jablonski expressed repeated concern with the condition of the home as well as a concern with the sleeping arrangements of J.P.-M. because he shared a room with a young cousin who had allegedly engaged in sexually inappropriate contact with other children. Jablonski testified that the parents would clean up the home when they were faced with an immediate threat of removal of the children, but then allowed the house to revert to its previous form. Eventually, the caseworker felt she could no longer be of service to the family and the voluntary case plan was closed in August 2005. *Page 3 
 {¶ 5} The present case rose on September 7, 2005, when the police responded to a noon-time report that three-year old J.P.-M. was outside, unsupervised, and unclothed. The child identified his home, and the police found the door to the home to be open. The police found two more unsupervised children in the home: D.P.-M., aged one, and X.P.-M., aged three months. All the children were said to be hungry, dirty, and wearing only dirty diapers. The youngest, X.P-M., had not received his medication that morning. The officers discovered three adults on the upper levels of the home, all asleep. Father was not present at the time. The home was reported to be unsanitary and unsafe, with insects, animal feces, debris, garbage and clothing covering the floors. The police officers removed the children from the home pursuant to Juv.R. 6. Mother later pled guilty to a charge of child endangering in regard to J.P.-M.
 {¶ 6} Following the removal of the children from the home, CSB filed complaints in the juvenile court. When those complaints were not timely heard, they were dismissed. On December 7, 2005, CSB re-filed the complaints, alleging that J.P.-M. was abused, neglected, and dependent; and that D.P.-M. and X.P.-M. were neglected and dependent. The agency sought temporary custody of the children.
 {¶ 7} On January 23, 2006, all three children were adjudicated to be neglected and dependent. Allegations of abuse regarding J.P.-M. were dismissed. *Page 4 
On February 14, 2006, the children were placed in the temporary custody of CSB and the proposed case plan was adopted by the trial court.
 {¶ 8} The case plan objectives required the parents to: (1) obtain and maintain employment for six months; (2) obtain safe, stable housing; (3) attend parenting classes, so as to be able to provide a daily structure for the children and demonstrate appropriate parenting skills; (4) participate in a psychological/parenting assessment and follow all recommendations; (5) abstain from drugs and alcohol, participate in a drug assessment, and submit to random urine screens; (6) attend the medical appointments of the children; and (7) address incidents of verbal and physical altercations by participating in couple's counseling and anger management. Mother was also to participate in individual counseling.
 {¶ 9} On November 6, 2006, CSB moved for permanent custody. Each parent moved for a six-month extension of temporary custody, and Father requested increased visitation. On March 23, 2007, the trial court granted CSB's motion for permanent custody, denied all motions for extensions of temporary custody, and dismissed all other motions as moot.
 {¶ 10} Mother and Father have appealed separately. Each parent has assigned three errors for review. The assignments of error are combined where they raise similar issues. *Page 5 
 MOTHER'S ASSIGNMENT OF ERROR I
"The trial court erred in denying a six month extension to [Mother]."
 FATHER'S ASSIGNMENT OF ERROR II "The trial court erred by not granting [Father's] motion for a first six month extension where [F]ather made substantial progress on his case plan and CSB failed to use reasonable efforts to reunite."
 {¶ 11} By these assignments of error, the parents have asserted that the trial court erred when it denied their motions for a six-month extension of temporary custody.
 {¶ 12} The decision to grant or deny an extension of temporary custody is a discretionary one. See R.C. 2151.415(D)(1) and (2). Before a trial court is authorized to exercise that discretion, however, it must find, by clear and convincing evidence, that three things are true: "(1) that such an extension is in the best interests of the child, (2) that there has been significant progress on the case plan, and (3) that there is reasonable cause to believe that the child will be reunified with a parent or otherwise permanently placed within the period of extension"In re P.B., 9th Dist. No. 23276, 2006-Ohio-5419, at ¶ 36, citing R.C.2151.415(D)(1).
 {¶ 13} Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985), 18 Ohio St. 3d 361,368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. *Page 6 
 {¶ 14} The trial court found that it was in the best interests of the children to be placed in the permanent custody of the agency, implicitly finding that an extension of temporary custody would not be in their best interests. See R.C. 2151.415(D)(1). The trial court also found that the evidence failed to establish significant progress on case plan goals or that a return to parental custody was likely within an extension of temporary custody. See id.
 {¶ 15} On appeal, both parents have argued that they made significant progress on the case plan and, in addition, that CSB failed to use reasonable efforts in some regards, which failure contributed to a lack of compliance with some portions of the case plan. Secondly, Mother argues that the children could be reunified within a six-month extension, but essentially bases her argument on the view that the parents had made significant progress on the case plan. Since the trial court found otherwise and we have affirmed that conclusion herein, this argument is overruled. See ¶ 35, infra. Finally, Mother argues that the best interests of the children support an extension. That issue has been resolved against the parents within the discussion of the assignment of error which challenges the judgment as being against the manifest weight of the evidence. See ¶ 51, infra.
 {¶ 16} Accordingly, we next consider the arguments made regarding the progress of the parents on the objectives of their case plan. *Page 7 
Housing and Employment {¶ 17} The trial judge found a lack of significant progress by the parents in achieving safe, stable housing. During the two years of the voluntary case plan and at the time of the removal of the children, the parents and their three children were staying in a home on Fess Avenue in Akron with several relatives. Those relatives included Mother's father and Mother's sister along with her husband and their child. The home was owned at the time by Mother's father.
 {¶ 18} During the voluntary case plan, the home was frequently reported to be in a deplorable and unsanitary condition, and was particularly so at the time of the removal of the children. The caseworker described the problems at the home and explained that there were dishes piled in the sink for weeks at a time, overflowing garbage, a broken patio window, bad odor, dog feces in the house, and the clutter of clothing and old food everywhere. She said there was so much clutter that one could not find the baby's crib because it was often filled with debris.
 {¶ 19} Shortly after the September 2005 removal of the children, the parents left the Fess Avenue home and moved into the home of Father's mother. In April 2006, the parents returned to the Fess Avenue home under an agreement with the new landlord to repair and remodel the home in exchange for partial payment of rent. *Page 8 
 {¶ 20} A July 2006 visit by the caseworker revealed a "very noticeable" improvement. The parents had cleared out the trash and repaired the outside stairs. Father had been sanding walls, painting rooms, and removing drywall in preparation for replacement. They removed some safety hazards, and the family was no longer using unapproved attic space as a sleeping area. However, by October 2006, progress had slowed and the parents permitted the house to return to its earlier condition. The parents claimed they were halted in their remodeling efforts because the landlord had failed to supply materials for remodeling. The problems went beyond a mere slowdown in remodeling, however. On her October 2006 visit, the caseworker found three adults sleeping in one bed, no linens on the beds and soiled mattresses, numerous liquor bottles, excessive garbage and clutter on the porch, and dried dog feces in the room planned for the children.
 {¶ 21} The parents left the Fess Avenue home in November 2006, reportedly because they received a threat of harm from the owner if they did not move out, and returned to the home of Father's mother. That home was reported to be clean, but even the parents agreed that it did not have sufficient room for the children.
 {¶ 22} One year after the adoption of the case plan, four months after the motion for permanent custody was filed, and nearly three years after the issue of housing was first raised through the voluntary case plan, Father applied for housing with the Akron Metropolitan Housing Authority ("AMHA") in January *Page 9 
2007. Because the goal of the case plan was no longer reunification, Father's application was placed on a waiting list with no indication of when he might obtain housing.
 {¶ 23} Father explained that he had not applied for AMHA housing earlier, because he wanted to avoid the crime problems that he believed existed in such housing. He had hoped instead to make the Fess Avenue home appropriate for his children. He admitted that he did not explore other options, such as Section Eight housing, though he was aware of that as a possibility. Mother had not applied for any other housing, because she expected to remain at the Fess Avenue home and, otherwise, merely relied on Father to make their housing arrangements.
 {¶ 24} On appeal, the parents have argued that they had stable housing on Fess Avenue for six months, clean housing with Father's mother, and were presently seeking independent housing through AMHA. The trial judge noted that Father had maintained steady employment at a fast food restaurant for more than a year and had been promoted to shift manager. Mother had worked anywhere from four to 40 hours per week, but had recently been working only four to ten hours per week. CSB conceded that the parents had complied with the employment objective, though they wished Mother worked more hours.
 {¶ 25} The trial judge was forced to conclude that, eighteen months after the removal of the children, the parents were still unable to provide a clean and *Page 10 
stable home for their children and they have, therefore, failed to make significant progress towards this case plan objective.
Parenting and Counseling {¶ 26} The trial judge found that the parents failed to demonstrate substantial progress on the parenting objective in their case plan.
 {¶ 27} Dr. Lynn Luna Jones, a psychologist with Summit Psychological Associates, testified regarding her parenting assessments of the parents. She credited Mother with being knowledgeable about her children's medical conditions. Mother had learned CPR and took lessons regarding the special medical needs of her three children. Dr. Luna Jones also testified, however, that Mother tended to be dependent and had abused alcohol, and that Father was impulsive and oppositional, with a history of physical aggression and substance abuse. According to the psychologist, Father tested positive for marijuana, cocaine and amphetamines shortly after the children were removed. Dr. Luna Jones felt that both parents lacked effective skills to manage conflicts, which impacted their ability to attend to their children. Both parents had had significant discipline problems in school and left school in the ninth grade. Mother became pregnant with their first child at 16. Both parents admitted that the Fess Avenue home was in poor condition and very unclean. Mother told Dr. Luna Jones that it was too difficult to keep up with the house, and Father refused to clean up after others living in the home. He also said Mother may be overwhelmed by the care *Page 11 
of three small and needy children. The parents had gone through several separations lasting one month or two and several incidents of physical aggression. Though the parents have each expressed that they are no longer "a couple," they intended to live together and raise the children together.
 {¶ 28} Based on her evaluation, the psychologist recommended that the children should not be returned to the parents until the parents completed couple's counseling and demonstrated that they were abstaining from alcohol and drug use. In addition, Father was to complete anger management counseling and Mother was to complete individual counseling.
 {¶ 29} Regarding these recommendations, the trial court found that the parents had not made substantial progress in addressing the problems in their relationship. They attended just four sessions of couple's counseling and were soon terminated from the program for lack of attendance. Part of the reason for the lack of attendance was said to have been Father's heavy work schedule at the time, but some of it also stemmed from the parents' own changing view of their relationship. The parents each stated that they intended to continue to live together, but no longer considered themselves "a couple" with a romantic relationship. Mother did not believe that couple's counseling was an issue any longer despite a history that included domestic violence and separations. The trial court concluded that, notwithstanding their changing relationship, couple's counseling would be beneficial to them and their ability to care for their children. *Page 12 
 {¶ 30} Second, the trial court found that Father successfully completed the objective regarding substance abuse and demonstrated that he had refrained from further use, but Mother had not made substantial progress on this objective in that she was not consistent in providing random urine drops until January 2007, and had not attended the recommended substance abuse counseling.
 {¶ 31} Third, the trial court found that Father had successfully completed anger management counseling. A separate portion of the case plan required Mother to attend anger management counseling as well. The trial court noted that Mother had made "substantial progress" towards completion of the requirement when she attended seven of eight scheduled sessions, but that Mother failed to attend the last class as had been expected by her counselor.[1]
 {¶ 32} Fourth, the trial court found that Mother successfully completed the requirement of individual counseling.
 {¶ 33} The case plan separately required the parents to complete parenting classes. The parents began classes at St. Joseph's Parenting Center in the fall of 2005, but were terminated in January 2006, because they failed to pay the required *Page 13 
deposit for an anger management workbook. The parents did not attempt to return there, and failed to initiate classes at any other center for nearly a year. They began a parenting program at Catholic Social Services in January 2007, but did not complete it. In attempting to persuade this Court that she substantially completed this requirement, Mother has argued that she attended numerous parenting classes and has pointed to her testimony that she obtained good information from the parenting classes and believed the classes were beneficial. When Mother was asked to recount the best thing that she had learned in the classes, she could not provide an answer. When Mother was asked to recount anything that she had learned in the classes, she replied only by saying: "How to deal with a little bit of my anger, `cause they dealt with anger management too. I can't think of any of the other ones right now." The trial court found that the parents failed to demonstrate substantial progress on this aspect of the case plan.
 {¶ 34} Next, the trial court found that the parents did not substantially comply with the requirement that they attend their children's medical appointments. The parents argue that the list of dates and times provided by CSB did not include locations. The trial court found that the parents never asked for that information. On appeal, the parents have argued that CSB failed to use *Page 14 
reasonable efforts because they did not proffer that information initially.[2] The trial judge reasonably concluded that "[r]esponsible parents with three children, all of whom have particular medical needs, would make inquiry without prompting."
 {¶ 35} In conclusion, the trial court found that the parents failed to meet two objectives which were central to this case: obtaining safe, stable housing and attending parenting classes so as to demonstrate appropriate parenting skills. In addition, it is significant that the parents failed to complete couple's counseling and that Mother failed to comply with the recommendations which flowed from her substance abuse evaluation. Upon this record, this Court concludes that the trial court did not abuse its discretion when it denied the parents' motions for a six-month extension of temporary custody.
 MOTHER'S ASSIGNMENT OF ERROR II "The trial court's decision granting permanent custody is against the manifest weight of the evidence." FATHER'S ASSIGNMENT OF ERROR I "The trial court erred as a matter of law in terminating "[Father's] parental rights as it was not supported by clear and convincing evidence and was against the manifest weight of the evidence." *Page 15 
 {¶ 36} Both parents have contended that the decision of the trial court terminating their parental rights is not supported by the weight of the evidence.
 {¶ 37} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95,99.
 {¶ 38} The Ohio Supreme Court has recently reaffirmed that the manifest weight of the evidence standard to be applied in civil cases is that standard which was explained in C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, syllabus. See State v. Wilson,113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 24. Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in a permanent custody case, it must determine whether the judgment of the trier of fact was supported by "some competent, credible evidence going to all the essential elements of the case[.]" C.E.Morris, *Page 16 
54 Ohio St.2d at syllabus. If the judgment is so supported, then the judgment of the trial court must be affirmed. Wilson, at ¶ 26.
 {¶ 39} As to the first prong of the permanent custody test, R.C.2151.414(E) provides that the trial court is required to enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent if the court determines that one of the factors set forth in that section exists as to each of the child's parents. Pursuant to that statute, the trial court determined that the parents in this case failed to remedy the conditions requiring removal, and that determination mandates a finding that the children cannot or should not be returned to their care. See R.C.2151.414(E)(1). The parents challenge that finding as being unsupported by the weight of the evidence.
 {¶ 40} The children were initially removed from the home when they were found to be hungry, dirty, and without adult supervision in a hazardous home situation. By the time of the permanent custody hearing, the parents still had not obtained safe, stable housing for their family, had not completed parenting classes, and had not completed couple's counseling. All of these case plan objectives were designed to assist the parents with the ability to provide the children with a safe home and the care which they require.
 {¶ 41} The trial court also considered the fact that the children had special needs. J.P.-M. requires a great deal of structure due to the sexualized behavior he exhibited. The child has exhibited a strong bond with the foster mother during *Page 17 
counseling sessions and occasions of sexualized behavior have decreased, which the counselor attributed to the foster family's willingness to establish structure and boundaries. The other children also have special medical needs that require additional attention.
 {¶ 42} This Court concludes that the trial court's finding that the parents have failed to remedy the conditions requiring removal and, therefore, that children cannot or should not be returned to the parents is supported by the weight of the evidence.
 {¶ 43} The parents have also argued that the trial court's determination regarding the second prong of the permanent custody test is not supported by the weight of the evidence. When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; *Page 18 
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 "(5) Whether any of the factors in divisions (E) (7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5).
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711 at *3; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 44} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will "`produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'"In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quotingCross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 45} We therefore proceed to consider the evidence regarding the best interest factors as set forth in R.C. 2151.414(D). The first best interest factor requires consideration of the relevant personal interactions and interrelationships of the children. The two older children were said to share a bond with their parents and to enjoy seeing them at visits. The parents' bond with the youngest child is less strong since he was removed at four months of age. The parents were *Page 19 
consistent in their visits, missing only three visits over the course of 18 months. Mother showed affection for the children, giving them hugs and kisses. J.P-M. and D.P-M. are particularly close to each other, and the caseworker testified that she felt it was important for the siblings to stay together. Except for the fact that the children resided for a time with the paternal grandmother, there was little evidence of a continuing relationship between the children and other relatives.
 {¶ 46} All the children were bonded with the foster parents and foster siblings. The foster parents have demonstrated a commitment to the children in that they have provided the structure needed to deal with the sexualized behaviors demonstrated by J.P.-M. and D.P.-M., and have provided special food for X.P.-M.'s needs.
 {¶ 47} As to the wishes of the children, it may be noted that they were four years, three years, and 22 months old at the time of the permanent custody hearing. According to the caseworker, the oldest child, J.P.-M., has said he wishes to remain in the foster home. According to Mother, the child told her he wanted to return home. The guardian ad litem opposed an extension of temporary custody and stated her belief that permanent custody would be in the best interests of the children.
 {¶ 48} The third best interest factor requires consideration of the custodial history of the children. During the voluntary case plan, J.P-M. was placed with the paternal grandmother for about two weeks while the home was being cleaned *Page 20 
up. When the children were removed from their home in September 2005, the two oldest children were placed in neighboring foster homes, and X.P.-M., the youngest, was placed in a different foster home. The two oldest children were subsequently placed with the paternal grandmother. In August 2006, the grandmother's health prohibited her from caring for them any longer, and they were placed in the same foster home where X.P.-M. resided. The children had been in the custody of CSB for nearly eighteen months by the time of the permanent custody hearing.
 {¶ 49} As to the fourth best interest factor, there was evidence before the trial court that the children were in need of a legally secure placement. The parents were not in a position to provide them with an adequate home and also failed to demonstrate that they are in a position to provide adequate care and supervision for them. There were no suitable friends or relatives willing to provide for their care. The foster parents were interested in adopting the children if permanent custody were granted.
 {¶ 50} The trial court found that Mother's conviction for child endangering did not come within the specific parameters of the fifth best interest factor.
 {¶ 51} Upon review, the record before this Court demonstrates that there was competent, credible evidence before the trial court from which it could conclude that permanent custody was in the children's best interests. Consequently, the trial court did not err in terminating Mother's and Father's *Page 21 
parental rights and placing the children in the permanent custody of CSB. Mother's second assignment of error and Father's first assignment of error are overruled.
 MOTHER'S ASSIGNMENT OF ERROR III "The trial court erred in failing to remove the guardian ad litem due to her personal bias and/or to appoint independent counsel for the children."
 FATHER'S ASSIGNMENT OF ERROR III "The trial court erred as a matter of law in failing to discharge the guardian ad litem upon receiving actual notice that she was biased and failed to faithfully and properly discharge her duties."
 {¶ 52} The argument of the parents is two-pronged. First, they have claimed that the trial judge should have appointed independent counsel for the children because there was a conflict between the wishes of the children and the opinion of the guardian ad litem. Second, the parents have asserted that the trial judge should have discharged the guardian ad litem due to bias.
 {¶ 53} In In re Williams, 101 Ohio St.3d 398, 2004-Ohio-1500, the Ohio Supreme Court held that a child who is the subject of a juvenile court proceeding to terminate parental rights may be entitled to independent counsel where the child's guardian ad litem recommends a disposition that conflicts with the child's wishes. Id., at syllabus and ¶ 18. In making this decision, "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the *Page 22 
possibility of the child's guardian ad litem being appointed to represent the child." Id. at ¶ 17. In Williams, the child was six years old and had repeatedly and consistently expressed a desire to remain with his mother. See id., at ¶ 2, ¶ 4, ¶ 5, and ¶ 6.
 {¶ 54} In In re J.B., 9th Dist. No. 23436, 2007-Ohio-620, at ¶ 22, this Court followed Williams and concluded that independent counsel was not required where the child was 42-months old, had developmental delays related to social and cognitive skills, and there was no evidence the child ever affirmatively expressed a desire to return to live with his mother, much less did he do so repeatedly.
 {¶ 55} In the present case, the guardian ad litem recommended a disposition of permanent custody to CSB. In an effort to establish a conflict between her opinion and that of a child, the parents have pointed to Mother's testimony that, during a visit, 4-year-old J.P.-M. told Mother "that he wants to come home."[3] Mother also pointed to testimony by the caseworker that the two older children appear to be bonded to their parents during visits.
 {¶ 56} This Court has previously held that the presence of bonding between parents and children does not equate to an affirmative decision to return home on a *Page 23 
permanent basis. See id., at ¶ 23. Thus, the record in this case offers only one comment by a four-year-old child suggesting that he "wants to come home" and that comment did not surface until the last day of the permanent custody hearing. There is no evidence that this statement reflects a repeated or consistently held opinion. The caseworker testified that J.P.-M. told her he wished to remain with the foster parents. Furthermore, the child's counselor recognized that J.P.-M. was making good progress in the foster home and appeared to find comfort from the foster mother. Upon such facts, it is not necessary to conduct a hearing or appoint independent counsel for the child. The trial court did not err in failing to appoint independent counsel for one or more of the children in this case.
 {¶ 57} Next, the parents assert error in the failure of the trial judge to appoint a new guardian ad litem because of bias. Because no objection was lodged below, Mother asks the Court to review this issue under a plain error standard of review. Civil plain error is limited to "the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss v. Davidson (1997),79 Ohio St.3d 116, syllabus. Recognition of plain error requires three things: "`(1) there must be an error, i.e., a deviation from a legal rule, (2) the error must be plain, which means that it must be an obvious defect in the trial proceedings, and (3) the error must have affected *Page 24 
substantial rights, which means that the trial court's error must have affected the outcome of the trial.'" (Internal quotations omitted.)State v. Gross, 97 Ohio St.3d 121, 134, 2002-Ohio-5524, at ¶ 45, quotingState v. Barnes (2002), 94 Ohio St.3d 21, 27.
 {¶ 58} We find no plain error here. The guardian ad litem's primary duty is to protect the child's interests. Juv.R. 4(B); R.C.2151.281(B)(1). R.C. 2151.281(I) sets forth the duties of a guardian ad litem as follows:
 "The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child."
Where the guardian ad litem fails in the exercise of her duties, R.C.2151.281(D) provides that the trial court shall discharge the guardian ad litem and appoint another guardian ad litem.
 {¶ 59} The parents have not argued that the guardian ad litem failed to investigate, mediate, monitor or otherwise comply with the duties set out in R.C. 2151.281(I), but, instead, have charged that she exhibited bias during the permanent custody hearing. As examples of that purported bias, they have pointed to her lengthy examinations of witnesses and have argued that the opinion of the guardian ad litem was evident to the trial court from her questions and general conduct. *Page 25 
 {¶ 60} One of the ways in which a guardian ad litem can protect his or her client's best interests is to question witnesses. "Nothing prohibits a guardian ad litem from generally fulfilling this role by questioning witnesses during court proceedings, as long as the guardian is a licensed attorney." In re Nibert, 4th Dist. No. 05CA13, 2006-Ohio-1559, at ¶ 14. Asking questions in order to make sure that all relevant facts are before the court is consistent with the guardian ad litem's duty to protect the best interests of the children. Where a guardian ad litem eventually comes to a conclusion as to the best interests of children, the eliciting of information that supports that conclusion may well be consistent with his or her duty.
 {¶ 61} There was no objection by the parents to the questioning of the guardian ad litem. The trial judge, however, did note on the record that the guardian ad litem engaged in lengthy questioning and that her opinion was apparent. Based on a careful review of the record, we find that the trial judge made most of his comments in regard to the request of the guardian ad litem to present a closing argument. The trial judge denied that request, finding it inappropriate to the role of a guardian ad litem. Thus, the trial judge denied the guardian ad litem the opportunity to engage in an activity which he felt might be inappropriate.
 {¶ 62} Furthermore, as the trier of fact in this case, the trial judge would be expected to take the opinions and conduct of the guardian ad litem, as represented *Page 26 
at the hearing, into consideration as he weighed the evidence. Indeed, the trial court is obligated to determine the guardian ad litem's credibility and determine the weight to be given to any report. JohnA.L. v. Sheri B., 6th Dist. No. L-04-1250, 2005-Ohio-535, at ¶ 17. Here, the guardian ad litem was subject to questioning by the parents' attorneys and addressed several of the matters raised by the parents in their argument on appeal.
 {¶ 63} Moreover, it is important to recognize that a trial court is not bound by the recommendation of the guardian ad litem. In re AndrewB., 6th Dist. No. L-01-1440, 2002-Ohio-3977, at ¶ 64; Roberts v.McGrady (May 10, 1995), 9th Dist. No. 16986, at *4 (concluding that because a guardian ad litem's report is not dispositive, but merely evidence for the court's consideration, any unfair bias was harmless error). This Court is not suggesting that there could not be a situation where the guardian ad litem crosses a line, but that has not occurred here.
 {¶ 64} In addition, Father has pointed to the fact that the guardian ad litem gave a copy of her report to Dr. Luna Jones and has complained that the report designated several drug screens as being positive, when they actually represent missed screens. This matter was clarified during the examination of the guardian ad litem. In addition, Judy DiMizio, Father's substance abuse counselor, testified to Father's success in addressing the substance abuse portion of his case plan. The trial judge concluded, after hearing all of the evidence, that Father had *Page 27 
successfully completed this portion of the case plan. Consequently, any error in the sharing of this report did not result in prejudice to the parents.
 {¶ 65} The parents have also complained of an occasion where the trial judge indicated that he was insulted by the guardian ad litem's suggestion that what she had to say did not matter. The guardian apologized for the implications of her remark. There followed a discussion in which the trial judge suggested that the guardian ad litem should be careful to explain her title and position to witnesses so as not to cause undue confusion, and the guardian ad litem accepted the suggestion. We fail to see any prejudice to the parents in this exchange.
 {¶ 66} Other courts have recognized that the appearance of bias in a guardian ad litem does not always equate to prejudice where it reflects the guardian ad litem fulfilling his or her duty to his wards. See, e.g., MacFarlane v. MacFarlane, 8th Dist. No. 86835, 2006-Ohio-3155, at ¶ 37. Certainly, if the views of the guardian ad litem interfere with the performance of his or her duties or with the regular conduct of proceedings, then error will occur. But that is not the case here. There is no argument that the guardian ad litem failed to investigate the case, to file motions in the best interests of the children, to review the placement of the children, to monitor case plan services, or to submit her recommendation.
 {¶ 67} Indeed, our review of the record suggests that the guardian ad litem supported increased efforts toward reunification of the children with the parents at various points during the course of the proceedings. For example, at the May *Page 28 
2006 review hearing, the parents were making progress on their case plan, and the guardian ad litem suggested an increase in both visitation and telephone contact by the parents. Then, at the August 2006 review hearing, there was progress in some areas, but not in others. The guardian ad litem expressed concern with the lack of progress in selected areas, and made constructive suggestions to remedy those problems. She suggested including other relatives in the case plan and encouraged the parents to find alternative housing if the landlord did not cooperate in providing supplies quickly. The record does not suggest that she reacted in an inappropriately negative or prejudicial manner during the course of these proceedings. Consequently, the parties have not pointed to any evidence, nor are we aware of any examples, that suggest that the guardian ad litem failed to satisfy her duty pursuant to statute.
 {¶ 68} In conclusion, we find no plain error here. No exceptional circumstances affecting the basic fairness, integrity, or public reputation of the judicial process have been demonstrated. Further, it is not clear to us that any error occurred and, since the matter was noted by the trial judge, we cannot conclude that the matters argued by the parents on appeal affected the outcome of the trial. Mother's third assignment of error and Father's third assignment of error are overruled. *Page 29 
 {¶ 69} Mother's three assignments of error are overruled. Father's three assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
CARR, J., WHITMORE, J. CONCUR
[1] In his appellate brief, Father suggests that the trial court incorrectly found that Mother failed the anger management requirement because she completed only seven of the eight classes. The trial court did not so find. Rather, the trial judge found that Mother had made "substantial progress" on this goal, but noted that Mother's counselor clearly anticipated that Mother would attend the final session. The court then found that Mother's failure to return for the final class was a factor to consider in determining whether case plan goals could be met with an extension.
[2] In their appellate briefs, the parents contend that they did request this information, but CSB failed to provide it, whereas CSB contends that the information was never requested. Father testified that he observed Mother placing a phone call for the information, and that no call was returned by CSB. The trial court made a factual finding that no inquiry was made by either parent.
[3] In his statement of the facts, Father's appellate brief states that Father had "expressed [that the children] desire to remain with him." The transcript pages which are cited include testimony that visits went well, but they do not include any testimony suggesting that the children told Father that they wanted to return home to live with him on a permanent basis or otherwise. *Page 1