[Cite as *In re B.W.*, 2012-Ohio-3416.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

IN RE: B.W., J.W., J.W., D.W., R.W., T.W.

C.A. No. 12CA0016-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE Nos. 2011 01 NE 0002
 2011 01 NE 0003
 2011 01 NE 0004
 2011 01 NE 0005
 2011 01 NE 0006
 2011 01 NE 0007

DECISION AND JOURNAL ENTRY

Dated: July 30, 2012

WHITMORE, Presiding Judge.

{¶1} Appellant, Lynn W. ("Mother"), appeals from a judgment of the Medina County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her six minor children and placed them in the permanent custody of Medina County Job and Family Services ("MCJFS"). This Court affirms.

I

{¶2} Mother's family has a lengthy history with MCJFS, dating back to 2003. Because MCJFS presented extensive evidence to illustrate this history and its relevance to this case, more than a cursory review is in order. Although Mother has at least three other children who have been involved with MCJFS in prior cases, only her six minor children are at issue in the current case: B.W., born November 16, 1998; J.W., born October 29, 2000; J.W., born April

14, 2002; D.W., born December 1, 2003; R.W., born January 17, 2005; and T.W., born October 28, 2006.

{¶3} Although the father of all six children was involved in the prior dependency and neglect cases, he was not actively involved in the current case and is not a party to this appeal. At the time the children were most recently removed from the home, the father was no longer living there because he was incarcerated on a felony conviction of child endangering, as well as another, unidentified offense. He later voluntarily relinquished his parental rights. Although both parents had a responsibility to provide these six children with a safe and sanitary home, because the father did not appeal and did not contest the permanent custody motion, we will focus our review on the parental rights and responsibilities of Mother.

{¶4} During 2003, MCJFS first removed the children from the custody of both parents due to the unsanitary and unsafe living conditions in the home. The record includes few details about the 2003 case, except that the children were removed from the home for a short period of time while church volunteers came in to clean.

{¶5} By May 2005, the condition of the home had deteriorated to an even worse condition and the police removed the children pursuant to Juv.R. 6. Mother, and apparently also the father, were charged with and convicted of child endangering, a first degree misdemeanor. R.C. 2919.22(E)(1)(a). The record includes detailed testimony about the condition of the home in May 2005 from the detective who removed the children from the home. He described the home at that time as uninhabitable, with a foul odor, insects, and piles of dirty clothing, old food, and trash everywhere.

{¶6} The detective also identified photographs that were taken at that time, which MCJFS admitted as exhibits. The photographs depicted piles of dirty clothing, toys, trash, and

miscellaneous items scattered throughout the home. The clutter was wedged in corners, under every piece of furniture, and covered so much of each room that there was little usable space in the house. The kitchen sink and the bathtub in the downstairs bathroom were completely filled with dirty water, dirty dishes, and other debris. The inside of the refrigerator was filthy, with food spilled and caked all over it.

{¶7} One photograph depicted the then-youngest child sleeping in a crib that was surrounded by piles of dirty clothes, with an exposed electrical cord in one of the piles on the floor just beneath him. Another photo showed one of the older children lying on a sofa that was surrounded by piles of dirty clothing and unrelated items.

{¶8} The focus of the reunification goals in the 2005 case, as well as each subsequent case with this family, has remained essentially the same. In addition to providing her children with adequate supervision and a safe and sanitary home, Mother was required to complete parenting classes, obtain a current psychological evaluation, and follow through with any recommended counseling. The agency's concerns about Mother's mental health specifically focused on Mother's failure to understand that she had a responsibility to provide her children with a safe and sanitary home. The psychologist who performed Mother's mental health evaluation in the 2005 case expressed concern that Mother externalized responsibility for her family's situation, blaming her husband and children for failing to clean up after themselves. For that reason, MCJFS had concerns that the unsanitary conditions of the home would reoccur. Nonetheless, after volunteers again helped to clean the home, and the parents apparently demonstrated to MCJFS that they would work to keep the house clean, the children were returned to the home and the 2005 case was later closed.

{¶9} During March 2009, Wadsworth Police were sent to the home on an unrelated matter and discovered that the living conditions inside the home were again deplorable. The home was so unsanitary in 2009 that the city health department became involved and extermination was also required because mice were living in the walls. Professional cleaners inspected the home and informed MCJFS that most of the contents were contaminated and should be discarded. They further advised that anyone who entered the home should wear protective clothing and masks. Their estimate to clean the home was over $10,000, which was cost prohibitive, so the agency again enlisted the help of church volunteers to clean the family's home.

{¶10} An intake caseworker went to the home one week later and observed that, although some cleaning had been done, the home remained in an uninhabitable condition. Even while standing outside on the front porch, the intake worker smelled a strong, foul odor that was almost overwhelming inside the home, particularly in the basement. The caseworker described the huge volume of clothes, toys, food, and trash that was all over the home. The kitchen floor was sticky, the refrigerator was filthy, and food was stuck to the walls and ceiling. The caseworker could hear mice running in the walls and, as he talked to Mother in the living room, she swatted a broom at two mice that ran through the room. In her conversation with the caseworker, Mother again downplayed the significance of the problem and her responsibility for keeping the home clean. She explained to him that she was busy at work and felt it was the responsibility of her husband and children to keep the home clean.

{¶11} In August 2009, Mother was again convicted of child endangering. The trial court accepted her plea of guilty to the offense as a misdemeanor, even though it could have convicted her of a fourth-degree felony due to her prior conviction. R.C. 2919.22(E)(1)(a) and

(b). Mother was later placed on probation for a period of two years, on conditions that included maintaining a safe and sanitary home for her children. After the home was again cleaned by volunteers, the children were eventually returned to the home and the 2009 dependency and neglect case was closed.

{¶12} During the pendency of the 2009 dependency and neglect case, the father was also convicted of another offense of child endangering. Unlike Mother, he was convicted of the felony level of the offense, as well as another, unspecified felony. Because the father later voluntarily relinquished his parental rights, the details about his convictions and his role in the family were not fully developed in the record. The record does reveal that he was sentenced to a period of incarceration in 2009 and did not reside with the family again. His absence from the home was relevant, however, as it later became apparent to MCJFS that the father had played a more significant role than Mother in caring for the children and the home and that, without the father's assistance, the children apparently were left to fend for themselves.

{¶13} By January 2011, the children had been residing in the sole care of Mother for over a year and the condition of the home had again deteriorated. The current case began after some of the children informed school personnel about the deplorable living conditions in their home. The police detective who had removed them from the home in 2005 interviewed four of the children. Based on his prior experience with this family, the information that he received from the children, and his observation that each of them was filthy and wearing dirty and ill-fitting clothes, he obtained a warrant to search the home.

{¶14} The search revealed that the home was once again uninhabitable. In addition to the detective's testimony about the unsanitary living conditions in the home, MCJFS introduced several photographs and a video that the police recorded as they walked through the home. The

video showed the home completely strewn with trash, pieces of partially-eaten food, dirty dishes and containers, splattered food and crumbs, and random pieces of clothing, toys, and other items. The caseworker who had inspected the home in 2009 later verified that it was in even worse condition this time. In fact, upon the detective's initial entry into the home, he and the other officers went back to their vehicles to get protective clothing and masks before they walked through the home, due to the bad odor, filth, and insects in the home. The odor, which the detective described as a mixture of dirt, mold, and old food, was so overpowering that he put Vick's Vapo-Rub inside his mask to enable him to tolerate the smell.

{¶15} A continual crunching noise can be heard on the video recording as the police walked through the home, as they were unable to avoid stepping on the debris that was scattered everywhere. Food and other filth was smeared or splattered on all of the furniture, walls, kitchen cabinets and appliances, and even inside the cabinets. Much of the furniture was broken and a broken glass was on the floor under one piece of furniture among the other debris. The dishwasher and kitchen sink were completely filled with dirty water, dirty dishes, and trash. None of the plumbing in the kitchen was working. The downstairs bathroom was so full of debris and old food that the door could barely be opened. That bathroom had apparently been used as an extension of the kitchen, as the bathroom sink and bathtub were filled with dirty dishes and other trash and food items, including broken eggshells and dried egg yolk all over the side of the bathtub. An old turkey carcass was in a pan behind the bathroom door. At that time, however, the plumbing in the bathroom sink and toilet did not appear to be working.

{¶16} There was no clean space in the kitchen or bathroom, nor did there appear to be any clean dishes, towels, or other supplies. There was almost no edible food in the kitchen, other than approximately 15-20 unopened cans of food and a bag of noodles. Instead, the kitchen

table, counters, sink, floor, refrigerator, dishwasher, and cupboards were covered with crumbs and splattered food, debris, old food containers, dirty dishes, and utensils caked with food. Many of the containers and dishes contained prepared food that was rotting and covered with insects and/or mold. Dead and live insects were visible in the kitchen and bathroom and throughout the house.

{¶17} The video recording depicted similar conditions in every room of the house, with piles of trash, dirty clothes, unrelated items, and old pizza and other prepared food left inside containers or dishes, or randomly scattered about. Mixed in with the rotting food debris were the children's toys and clothing, some of which were lying right on top of plates with rotting food. In some rooms, the piles of debris appeared to have been shoved into corners and behind the furniture. Debris was strewn on the stairs and in the hallway leading to the upstairs bedrooms. In the bedrooms, most the beds had filthy, torn mattresses without sheets or pillows. The stairs leading to the basement were completely impassible because they were buried in debris.

{¶18} The children were removed pursuant to Juv.R. 6 and MCJFS filed complaints alleging that each child was dependent and neglected. The six children were placed in two separate foster homes, with the oldest three in one home and the youngest three in the other. They were filthy and hungry when they came into foster care. Each exhibited signs of neglect and was later diagnosed with adjustment disorder. Each child started counseling and later revealed to their counselors and foster parents that they had been left to care for themselves and each other and often did not have enough to eat.

{¶19} By failing to maintain a safe and sanitary home, Mother had violated the terms of her 2009 probation. She was convicted of five counts of child endangering, all fourth degree felonies, and remained incarcerated throughout most of this case. Although Mother could have

complied with many of the reunification goals of the case plan while in prison, she did not. Instead, she told the caseworker that her incarceration was her first vacation in twenty years and she chose to take classes that interested her. She did not obtain a psychological assessment or participate in any counseling and continued to shift the blame for her failure to provide her children with a safe and sanitary home. Mother also failed to maintain regular contact with her children while incarcerated and had no contact with them at all after she was released.

{¶20} On November 1, 2011, MCJFS moved for permanent custody of all six children. Following a hearing on the motion, the trial court found that the children could not be returned to Mother's home within a reasonable time or should not be returned to her home and that permanent custody was in their best interests. Consequently, it terminated Mother's parental rights and placed the children in the permanent custody of MCJFS. Mother appeals and raises three assignments of error.

II

Assignment of Error Number One

THE TRIAL COURT'S GRANT OF PERMANENT CUSTODY OF ALL SIX (6) CHILDREN TO [MCJFS] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT SUCH A DISPOSITION WAS IN THE BEST INTEREST OF THE CHILDREN.

{¶21} Through her first assignment of error, Mother argues that the trial court's permanent custody decision was not supported by the evidence presented at the hearing. We disagree.

{¶22} Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of children, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the children are abandoned, orphaned, have

been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interests of the children, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S*., 75 Ohio St.3d 95, 99 (1996).

{¶23} The trial court found that the first prong of the permanent custody test had been satisfied because the children could not be returned to Mother's home within a reasonable time or should not be returned to her home based on several factors under R.C. 2151.414(E), including that Mother: had failed to substantially remedy the conditions that caused the children's continued removal from her home, R.C. 2151.414(E)(1); demonstrated a lack of commitment to the children by failing to support, visit, or communicate with them when able to do so, R.C. 2151.414(E)(4); was incarcerated for an offense against her children at the time the motion was filed, R.C. 2151.414(E)(5); had been convicted more than once of child endangering against her children under R.C. 2919.22(A), R.C. 2151.414(E)(6); and had allowed the children to suffer neglect and that the likelihood of reoccurrence of that neglect posed a threat to the children's safety, R.C. 2151.414(E)(15). Mother does not specifically dispute any of the trial court's findings on the first prong of the permanent custody test. Moreover, the record includes substantial, undisputed evidence to support each of these findings.

{¶24} Mother focuses her challenge on the trial court's finding that permanent custody was in the best interests of her six children. When determining whether a grant of permanent custody is in a child's best interests, the juvenile court must consider the following factors:

(a) The interaction and interrelationship of the child[ren] with [their] parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child[ren], as expressed directly by [them] or through [their] guardian ad litem, with due regard for the maturity of [each] child;

(c) The custodial history of the child[ren], including whether [they] ha[ve] been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ***;

(d) The child[ren]'s need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]

R.C. 2151.414(D)(1)(a)-(d).[1]

**{¶25}** Because Mother was incarcerated throughout most of this case, her ability to interact with the children was limited to letters and phone calls, but there was no evidence that she sent any written communication to the children. Mother was permitted to make up to 20 minutes of phone calls from prison every Monday. MCJFS arranged for each foster family to have a prepaid cell phone so Mother could call the children on those phones from prison. After MCJFS and the foster families arranged for the children to be available for weekly phone calls, Mother had approximately 38 opportunities to call them while she was incarcerated, but she did not take advantage of her ability to maintain contact with them. During a period of nearly nine months, Mother called the older children five or six times and called the younger children only five times. The foster mothers testified that the children enjoyed hearing from Mother and would

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) does not apply to the facts of this case.

often ask why she did not call them more often. More significantly, during the two or three months before the permanent custody hearing, Mother was no longer incarcerated, yet she did not once contact the children by phone or letter, nor did she contact MCJFS to arrange for visits with them.

{¶26} Mother's lack of commitment to her children was further demonstrated through her comments to the caseworker that she viewed her time away from her children as a vacation. Mother told the caseworker that her incarceration was "the best thing that ever happened to her" because she finally had a chance to relax. The caseworker tried to encourage Mother to work on the reunification goals of the case plan, but Mother told the caseworker that she would request extensions of temporary custody and work toward reunification later.

{¶27} Consequently, although Mother had the opportunity to work on several of the case plan goals while in prison, rather than obtaining the required psychological assessment and counseling, Mother joined groups and took classes that interested her. Of particular concern to MCJFS was that Mother continued to accept no responsibility for the fact that her children had been raised in an uninhabitable environment. MCJFS had worked with Mother over a period of eight years, yet she still seemed to have no understanding that she had an obligation as a parent to provide her children with a safe and sanitary home.

{¶28} The interaction between Mother and the children during the periods that they did reside together was characterized by ongoing neglect. There was substantial evidence that Mother did not properly feed, supervise, of otherwise care for the children. According to the maternal grandmother, Mother never cooked for the children, but the older children would cook and care for the younger children and themselves or Father would cook for them, until he left the home in 2009.

{¶29} Even D.W., who was only seven years old when he last lived in Mother's home, would care for himself and his younger siblings. D.W. told his counselor that he often had to feed himself and that he was most often cared for by his older siblings, not his parents. D.W. further told his counselor about an incident when he burned himself while trying to prepare food.

{¶30} Because Mother did not obtain a psychological assessment, the state of her mental health is unclear. In addition to her failure to tend to her home and her children, however, there was other evidence to suggest that Mother suffered from untreated depression and anger issues, including that she spent a great deal of time in bed, while her children fended for themselves. There was further evidence that Mother had a volatile temper and would often yell at others in the home. D.W. told his counselor that her anger made the children sad.

{¶31} When the children were removed from Mother's home in 2011, they exhibited many signs of neglect. They were hungry, had not bathed for days, and were wearing clothes that were dirty, stained, ill-fitting, and inappropriate for the January weather. The foster mothers each testified that, when the children came into their care, they fed and bathed them and immediately took them shopping for clothes, as they were filthy and their clothes were not salvageable. The children had to be taught basic hygiene practices and some were even afraid of bathing because it was not a common experience for them. One of the foster mothers testified that she had trouble getting the children to sit down to eat, and some of them hoarded food, because they were afraid that there would not be enough for them to eat.

{¶32} While in foster care, the children had been working with the foster parents and their counselors to improve their social and coping skills. A counselor testified that each of the children had been diagnosed with adjustment disorder and also exhibited some symptoms of long-term neglect, including that they were anxious and distrustful of others. She further

testified that it was possible for them to overcome these symptoms through counseling and by living in a safe, stable, and structured environment. After spending several months in foster placements that were providing the children with such positive environments, the children were showing improvement in their behavior and outward appearance. Several witnesses testified about how the children's behavior and socialization had improved and that their hygiene was no longer a problem.

{¶33} The children had also been building a positive relationship with their foster families and with each other. According to the caseworker, each sibling group was comfortable and doing well in its respective foster home. The foster mothers had made arrangements to get all of the children together on a regular basis to engage in family activities and to maintain their sibling relationship.

{¶34} The guardian ad litem testified that the children had initially wanted to return to Mother's home but that, over time, most of them no longer expressed that desire or had waffled back and forth about their wishes. D.W.'s counselor further testified that, although he had initially expressed a desire to return to Mother's home, he no longer wanted to go home, unless he knew that Mother would be different. He did not want to return to the same living conditions as before.

{¶35} Mother argued at the hearing that there was a conflict between the wishes of the children and the recommendation of the guardian ad litem. Because the children's wishes were not entirely clear from the testimony and report of the guardian ad litem, the trial judge interviewed each child in camera. Most of the children expressed to the trial judge that they did not know where they wanted to live. The older J.W. told the judge that he wanted to stay in the foster home. Although seven-year-old R.W. said that he wanted to return to Mother's home, the

trial judge found that R.W. lacked sufficient maturity to decide where he wanted to live.  The guardian ad litem had also testified that she believed that R.W. lacked sufficient maturity to express his wishes and there is nothing in the record to dispute their findings.  Therefore, the trial judge was not required to consider the wishes of R.W., but could instead consider the recommendation of the guardian ad litem.  *See* R.C. 2151.414(D)(1)(b).

{¶36}  The guardian ad litem, who had been involved with this family since 2003, recommended permanent custody to MCJFS.  The guardian expressed concern that Mother had been given repeated opportunities to remedy the condition of her home but had not demonstrated any ability or desire to do so.  For more than eight years, Mother had continually repeated the same cycle: the children would be removed due to the deplorable condition of the home; with the help of outsiders, Mother's home would be cleaned; the children would be returned; and the condition of the home would eventually deteriorate again.  The caseworker testified that Mother did not demonstrate any understanding of her responsibility to provide her children with a safe and sanitary environment but seemed to believe that the agency would continually bring in outsiders to clean her home.

{¶37}  The custodial history of the children involved living in the temporary custody of the agency in this case for nearly a year and repeated removals from Mother's home over a period of eight years.  This Court has repeatedly stressed, however, that "the time period in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on th[ese] child[ren]." *In re C.M.*, 9th Dist. No. 21372, 2003-Ohio-5040, ¶ 16, quoting *In re Smith*, 9th Dist. No. 20711, 2002 WL 5178, *5 (Jan. 2, 2002).  As already explained in detail, the repeated removals of these children were due to the same problem and

Mother had made no progress in resolving it.  In fact, the condition of the home at the time of the most recent removal was even worse than in the past three cases.

{¶38}  The six children, who had spent most of their lives moving in and out of Mother's home, were in need of a legally secure permanent placement.  Mother had failed to demonstrate that she had the ability to provide her children with a suitable home and MCJFS had found no relatives who were willing and able to do so.  Consequently, the trial court reasonably concluded that adoption after permanent custody to the agency was the only way to achieve a legally secure permanent placement for these children.

{¶39}  Given the evidence presented at the hearing, the trial court reasonably concluded that permanent custody to MCJFS was in the best interests of B.W., J.W., J.W., D.W., R.W., and T.W.  Mother's first assignment of error is overruled.

Assignment of Error Number Two

THE CHILDREN WERE DENIED A FAIR HEARING AND THEIR DUE PROCESS RIGHTS BY THE TRIAL COURT'S FAILURE TO APPOINT COUNSEL FOR THE CHILDREN WHEN THEIR WISHES WERE IN CONFLICT WITH THE RECOMMENDATION OF THE GUARDIAN AD LITEM.

{¶40}  Mother next argues that the trial court denied the children a fair hearing because it failed to appoint independent counsel for the children due to the apparent conflict between the wishes of the children and the recommendation of the guardian ad litem.  We disagree.

{¶41}  When the record demonstrates that the children's wishes are in conflict with the recommendation of the guardian ad litem, the trial court should appoint independent counsel to represent a child who is of sufficient maturity. *See In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, ¶ 17-18, 29.   In this case, the guardian ad litem recommended permanent custody to MCJFS and testified that the children had waffled back and forth between indicating that they

wanted to return to Mother's home or stay with their foster families. Because the trial judge was concerned that there might be a conflict between the wishes of the children and the recommendation of the guardian ad litem, he interviewed each of the children in camera to ascertain their actual wishes at that time. At the time of the in camera interview, only R.W. expressed a desire to return to Mother's custody. The trial judge determined that R.W. lacked sufficient maturity to either decide where he wanted to live or to require the assistance of counsel.

{¶42} Moreover, even if R.W. were of sufficient maturity to work with counsel, the record fails to reveal that an actual conflict existed between R.W.'s wishes and the recommendation of the guardian ad litem. As this Court has repeatedly emphasized, to demonstrate a "conflict" between the child's wishes and the guardian's recommendation that permanent custody is in the child's best interest, the record must demonstrate that the child has repeatedly and consistently expressed the affirmative desire to return to the parent's home. *E.g., In re J.P.-M.*, 9th Dist. Nos. 23694 & 23714, 2007-Ohio-5412, ¶ 56; *In re J.B.*, 9th Dist. No. 23436, 2007-Ohio-620, ¶ 22-23. According to the guardian ad litem, all of the children had waffled back and forth about their wishes throughout this case. Because there was no evidence before the trial court that R.W. or any of the children had consistently and repeatedly expressed a desire to return to Mother's custody, there was no evidence of a conflict between their wishes and the recommendation of the guardian ad litem. Therefore, the trial court did not err in failing to appoint independent counsel for the children. Mother's second assignment of error is overruled.

Assignment of Error Number Three

THE TRIAL COURT ERRED BY ITS FAILURE TO DISCHARGE THE
GUARDIAN AD LITEM FOR FAILURE TO ADEQUATELY PERFORM HER
DUTIES AS REQUIRED BY R.C. 2151.281(D).

{¶43}  Mother's third assignment of error is that the trial court erred because it failed to discharge the guardian ad litem.  Specifically, she asserts that,  pursuant to R.C. 2151.281(D), the trial court was required to discharge the guardian for failing to fulfill her duties as set forth in R.C. 2151.281(B)(1) and (I) and in Sup.R. 48.  We disagree.

{¶44}  Mother did not request removal of the guardian ad litem in the trial court, but instead raises this issue for the first time on appeal.  As this Court has repeatedly emphasized, the Ohio General Assembly has expedited proceedings to terminate parental rights in an effort to prevent children from lingering in foster care and "[a parent] should not be permitted to impose an additional delay in the proceedings by raising a belated challenge for the first time on appeal[.]"  *In re T.E.*, 9th Dist. No. 22835, 2006-Ohio-254, ¶ 9.   Mother had the opportunity to raise this issue at the permanent custody hearing, but chose not to.  This Court is not inclined to reward Mother "for sitting idly on her rights by addressing an alleged error that should have been raised, and potentially rectified, in the trial court in a much more timely fashion."  *Id.*

{¶45}  Mother does not argue plain error, nor does the record demonstrate that the trial court's failure to remove the guardian affected "the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."  *Goldfuss v. Davidson*, 79 Ohio St.3d 116, (1997) syllabus.  As detailed above, there was overwhelming evidence before the trial court to support its conclusion that the children could not be returned to Mother's custody within a reasonable time or should not be returned to her home and that permanent custody was in their best interests.  Because any failure on the part of the

guardian ad litem did not affect the outcome of this case, the trial court's failure to remove her did not constitute plain error. Mother's third assignment of error is overruled.

III

{¶46} Mother's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, J.
MOORE, J.
<u>CONCUR.</u>

<u>APPEARANCES:</u>

CONRAD G. OLSON, Attorney at Law, for Appellant.

JENNIFER A. MOORE, Attorney at Law, for Appellee.

MARY ELLEN LESLIE, Guardian ad litem.