[Cite as *In re L.F.*, 2021-Ohio-3431.]

STATE OF OHIO     )
                    )ss:
COUNTY OF SUMMIT     )

IN RE: L.F., JR.

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

C.A. Nos.     29942
                 29954

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 19-04-000347

## DECISION AND JOURNAL ENTRY

Dated: September 29, 2021

HENSAL, Presiding Judge.

{¶1} Appellants Mother and Father appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed their child in the permanent custody of Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2} Mother and Father are the biological parents of L.F. (d.o.b. 11/3/11). When the child was seven years old, CSB filed a complaint alleging that he was an abused (endangered), neglected, and dependent child. The agency's supporting allegations included the child's exposure to domestic violence between Mother and Father, Mother's use of methamphetamine and marijuana, Mother's untreated mental health issues, and housing instability. CSB obtained an emergency order of temporary custody and a no contact order between Father and the child.

Both parents waived their hearing rights for shelter care and stipulated to probable cause for the child's removal from the home.

{¶3} At the adjudication, Mother and Father waived their rights to a hearing and stipulated to the allegations in the complaint as amended to delete references to neglect. L.F. was adjudicated an abused (endangered) and dependent child based on incidents of substance abuse and domestic violence in the parents' home. The juvenile court found that CSB had used reasonable efforts to prevent the child's removal from home.

{¶4} Mother waived her rights at the subsequent dispositional hearing, while Father failed to appear. After the presentation of evidence, the trial court found that the agency had used reasonable efforts, placed the child in the temporary custody of CSB, and adopted the agency's case plan as the order of the court. Pursuant to the case plan, Mother was required to obtain and maintain stable housing and employment, and to obtain chemical dependency and mental health assessments and follow all recommendations. Father was required to obtain a chemical dependency assessment and follow all recommendations; and to attend Stop the Cycle and Early Intervention classes offered through the Battered Women's Shelter, participate in anger and aggression counseling at Greenleaf, and demonstrate an understanding by refraining from further acts of domestic violence. The child was required to participate in counseling based on his exposure to domestic violence.

{¶5} The magistrate held three review hearings during the next seven months and found after each that the agency had used reasonable efforts to prevent the child's continued removal from his home. L.F. remained in the temporary custody of CSB as the parents failed to make much progress on their case plan objectives. The orders reflect that the child struggled with significant behavioral issues and consistently refused to have any contact with Father.

{¶6} After Father proposed his uncle and aunt as a placement option for the child, CSB performed a kinship assessment and subsequently approved the paternal relatives for placement. Based on the relatives' willingness to provide a permanent home for L.F., CSB filed a motion for legal custody to the paternal uncle and aunt under the agency's protective supervision. After the sunset dispositional hearing, the juvenile court granted the agency's motion and further awarded the parents supervised visitation to be determined by the parties. Within a month, however, the uncle and aunt were no longer willing to provide a home for the child based on his escalating destructive and violent behaviors. Accordingly, CSB filed a motion to modify disposition from protective supervision to emergency temporary custody and temporary custody of the child. After the requisite hearings, at which the juvenile court found that the agency had continued to use reasonable efforts, L.F. was returned to the temporary custody of CSB.

{¶7} CSB later filed a motion for permanent custody. The agency alleged that L.F. could not or should not be returned to his parents based on Mother's and Father's failures to remedy the conditions that led to the child's removal, Mother's chemical dependency, Mother's lack of commitment to the child, and Mother's abandonment of the child. CSB further alleged that permanent custody was necessary in the best interest of the child.

{¶8} Prior to the permanent custody hearing, Mother orally requested legal custody or, alternatively, a six-month extension of temporary custody. Father joined in Mother's requests and also alternatively proposed legal custody to himself. After the hearing, the juvenile court issued a judgment terminating Mother's and Father's parental rights and granting permanent custody of L.F. to CSB. The trial court found that the child could not or should not be returned to either parent based on their respective failures to remedy the concerns that necessitated the child's removal from the home. It further found that an award of permanent custody was in the

child's best interest and that CSB had used reasonable reunification efforts that the parents had failed to utilize.

{¶9} Mother and Father have each filed timely appeals. Mother raises one assignment of error for review, while Father raises three. This Court rearranges and consolidates some assignments of error to facilitate the discussion.

II.

## FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED THE PARENTS' RIGHTS AND PLACED THE CHILD IN THE PERMANENT CUSTODY OF CSB WHEN THE AGENCY DID NOT PROVIDE [FATHER] WITH REASONABLE REUNIFICATION EFFORTS.

{¶10} Father argues that CSB failed to use reasonable efforts to facilitate reunification of the child with Father. This Court disagrees.

{¶11} Revised Code Section 2151.419(A)(1) requires the juvenile court to determine whether the agency has used reasonable reunification efforts at any hearing at which the court removes the child from his home or continues the child's removal from his home. It is well settled that "the statute imposes no requirement for such a determination at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing." (Internal quotations omitted.) *In re L.R.*, 9th Dist. Summit Nos. 29266 and 29271, 2019-Ohio-2305, ¶ 14, quoting *In re A.C.-B.*, 9th Dist. Summit Nos. 28330 and 28349, 2017-Ohio-374, ¶ 22; *see also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 41-43 (concluding that a reasonable efforts determination is necessary at a permanent custody hearing only if the agency has not demonstrated its use of reasonable efforts prior to that time).

{¶12} In this case, the juvenile court consistently found that CSB had used reasonable efforts to prevent the child's continued removal from his home. Beginning with the shelter care hearing and continuing with adjudication, the initial disposition, multiple review hearings, and upon the child's subsequent removal from the home of his recently appointed legal custodians (his paternal uncle and aunt), the trial court made the requisite statutory reasonable efforts determinations. At no time did Father or any other party challenge those findings. In fact, when Father appeared at the two earliest hearings, he stipulated that the agency had used reasonable efforts.

{¶13} As Father failed to object or move to set aside any reasonable efforts determinations by the juvenile court, he has forfeited any challenge to the agency's use of reasonable efforts on appeal except for a claim of plain error. *See In re L.R.* at ¶ 18. Although Father references plain error in his captioned assignment of error, he fails to cite any legal standard[1] or make any argument to demonstrate plain error. Moreover, Father has not provided any transcripts of the prior hearings after which the juvenile court consistently found CSB's use of reasonable efforts. Accordingly, this Court must presume regularity as to those reasonable efforts determinations. *See id*.

{¶14} To the extent that Father argues that CSB should have "implemented more intensive counseling and more intensive services[,]" such as family counseling and additional classroom services for the child, Father misconstrues the agency's role. While the agency has a duty pursuant to Section 2151.412(A)(2) and (G)(1)(b) to "prepare and maintain a case plan" with the goal of reunifying the child with his parents, the agency identifies and makes referrals

---

[1] Although Father writes that the plain error standard is the same as that set out in his first assignment of error, his first assigned error also omits a standard of review for plain error.

for services designed to address the concerns underlying the child's removal from home.  For example, the agency may require mental health, parenting, chemical dependency, educational, and the like, services and make referrals to other professionals who are competent to provide such services.  It is those professionals who develop the particulars of treatment and therapies.  Here, as will be addressed in greater detail later in the opinion, the child's schools engaged in a variety of ever increasing intensive measures to address the child's ongoing behavioral issues.  In addition, the child was receiving counseling multiple times each week; and, based on the child's vehement refusals to have any relationship with Father, the counselor never recommended or supported family counseling with Father and the child.  CSB's deferral to the professionals who implement the services outlined in the agency's case plan objectives for the parties is precisely the point of referrals and cannot form the basis for a claim of lack of reasonable efforts.  Father's second assignment of error is overruled.

### FATHER'S ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED PLAIN ERROR AND REVERSIBLE ERROR WHEN IT DID NOT APPOINT AN ATTORNEY FOR THE CHILD AFTER THE CHILD EXPRESSED TO HIS COUNSELOR THAT HE DESIRED TO RESIDE WITH MOTHER.

{¶15}  Father argues that the juvenile court erred by failing to appoint an attorney for L.F. as his wishes conflicted with the recommendation of the guardian ad litem.  This Court disagrees.

{¶16}  Section 2151.352 and Juvenile Rule 4(A) accord all parties in juvenile proceedings, including the subject minor child, the right to representation by counsel.  The juvenile court may appoint an attorney to serve in the dual role of both attorney and guardian ad litem for a child.  *See In re T.E.*, 9th Dist. Summit No. 22835, 2006-Ohio-254, ¶ 4.  It did so in this case.

{¶17} Nevertheless, we note that "the Ohio Supreme Court [has] held that a child who is the subject of a juvenile court proceeding to terminate parental rights may be entitled to independent counsel where the child's guardian ad litem recommends a disposition that conflicts with the child's wishes." *In re J.P.-M.*, 9th Dist. Summit Nos. 23694 and 23714, 2007-Ohio-5412, ¶ 53, citing *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, syllabus and ¶ 18. In determining whether to appoint independent counsel for a child, the juvenile court should consider the particular circumstances of the case, including the child's maturity and whether the guardian ad litem can adequately represent the child. *In re J.P.-M.* at ¶ 53.

{¶18} Even so, it is well settled that "[w]here there is an affirmative demonstration of a conflict between the views of the attorney guardian ad litem and the wishes of the child[ ], the trial court is obligated to appoint independent legal counsel to represent the child[ ]." *In re K.H.*, 9th Dist. Summit No. 22765, 2005-Ohio-6323, ¶ 38. *See also* Juv.R. 4(C) ("If a person is serving as Guardian ad litem for a child or ward, and the court finds a conflict exists between the role of the Guardian ad litem and the interest or wishes of the child [or] the ward, the court shall appoint counsel for the child or ward.") This Court has clarified on many occasions, however, that "to demonstrate a 'conflict' between the child's wishes and the guardian's recommendation that permanent custody is in the child's best interest, the record must demonstrate that the child has repeatedly and consistently expressed the affirmative desire to return to the parent's home." *In re B.W.*, 9th Dist. Medina No. 12CA0016-M, 2012-Ohio-3416, ¶ 42, citing *e.g., In re J.P.-M.* at ¶ 56, and *In re J.B.*, 9th Dist. Summit No. 23436, 2007-Ohio- 620, ¶ 22-23.

{¶19} In this case, there was no evidence of the child's purported desire to return to Mother's home until one of the child's counselors testified at the permanent custody hearing that L.F. had discussed Mother in "just a few" sessions and indicated without elaboration sometime

during the previous year that he wanted to go back with Mother. The guardian ad litem reported, however, that throughout the entire case, L.F. was either unable or unwilling to express his wishes regarding custody to her. In fact, the guardian ad litem testified that, even with the intervention of the child's therapist, L.F. told the guardian that he did not know where he wanted to live. Several reports filed by the guardian ad litem throughout the case bear out the guardian's assertion that she was unable to ascertain the child's wishes for custody, although the child always remained adamant in his refusal to have any relationship with Father.

{¶20} L.F.'s isolated comments to his counselor that he liked Mother and wanted to go back with her does not rise to the level of repeated and consistent expressions of the affirmative desire to return home. Despite multiple attempts by the guardian ad litem, even with the counselor's encouragement of the child, L.F. never conveyed his wishes regarding custody to the guardian ad litem. Accordingly, the record fails to demonstrate a conflict that required the juvenile court to appoint independent counsel for the child. Father's third assignment of error is overruled.

## FATHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED PLAIN ERROR AND REVERSIBLE ERROR IN DENYING MOTHER'S MOTION FOR LEGAL CUSTODY OF [THE CHILD] AND IN FINDING THAT IT WAS IN [THE CHILD'S] BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF [CSB]. THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN DENYING MOTHER'S MOTION FOR LEGAL CUSTODY OR IN THE ALTERNATIVE MOTHER'S MOTION FOR SIX-MONTH EXTENSION AND IN FINDING THAT IT WAS IN THE CHILD'S BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF CSB. THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶21} Mother and Father argue the judgment terminating their parental rights and placing L.F. in the permanent custody of CSB was against the manifest weight of the evidence. This Court disagrees.

{¶22} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶23} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in Section

2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶24} Here, although CSB alleged two first-prong grounds, the juvenile court only made a finding as to one. Specifically, the trial court found that the agency met its burden of proof to demonstrate that L.F. could not or should not be returned to either parent's custody pursuant to Section 2151.414(B)(1)(a). The juvenile court moreover relied on the agency's claimed basis that both parents had failed to remedy the conditions that gave rise to the child's removal from the home pursuant to Section 2151.414(E)(1), which provides:

> In determining at a hearing [on a motion for permanent custody] whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a [permanent custody] hearing * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶25} L.F. was removed from his parents' home based on Mother's untreated mental health issues, her ongoing substance abuse that impacted her ability to provide adequate care for the child, and multiple incidents of domestic violence between Mother and Father and to which

the child bore witness. Further investigation indicated that Father also had substance abuse issues. Despite case plan objectives focused on those concerns, as well as the agency's referrals to numerous service providers so the parents could address the issues that interfered with their abilities to provide a safe and stable home environment for the child, neither Mother nor Father made significant progress.

{¶26} Although the caseworker made referrals for Mother to obtain mental health services from three different providers, Mother only ever promised to make appointments, but never did. Mother was at times employed, but never held any job for very long. She was homeless for a period of time during the case and eventually moved in with her sister's former fiancé. Although that home was structurally appropriate for the child, Mother was not on the lease and could be asked to leave at any time.

{¶27} Mother initially sought substance abuse treatment, but she ceased all participation within a few months once she lost her housing. Although Mother reengaged with drug treatment at Bright View approximately one year into the case, she quit after two weeks. Bright View terminated Mother for lack of participation on two separate occasions. At the time of the permanent custody hearing, Mother had just reengaged with Bright View for a third time, attending her first appointment, but missing her second. Although Mother consistently tested positive for methamphetamine throughout the case, and occasionally tested positive for marijuana and fentanyl, she denied that she was using drugs.

{¶28} Father lost his housing several months before the permanent custody hearing when his apartment ceiling collapsed, but he obtained alternative housing which the caseworker had not had an opportunity to view. Father was employed throughout the case.

{¶29} Although Father completed both the Stop the Cycle and Early Intervention two-hour classes, he never followed up with the agency's referral to Greenleaf for anger management services. When Father informed the caseworker that he would prefer to seek anger management services at Portage Path Behavioral Health, she approved. Nevertheless, Father failed to engage in services there either. Consistently throughout the case, Father downplayed his anger and engagement in domestic violence. He denied any fault relating to the altercations, as well as any impact on the child who witnessed many instances of violence between his parents. Father blamed Mother for putting ideas in the child's head and showed no insight regarding his role in a situation which harmed L.F.

{¶30} Finally, based both on Father's admission and reports from others that Father had issues with abusing alcohol, the caseworker made substance abuse referrals to Community Health Center and another service provider in Stark County where Father lived. Despite the caseworker's encouragement, Father failed to initiate any alcohol abuse services.

{¶31} Both parents struggled with multiple issues that impacted their abilities to parent L.F. appropriately and provide a safe and stable home for him. In the more than 18 months from the adoption of the case plan until the permanent custody hearing, neither parent took advantage of available services geared toward addressing their issues. Moreover, neither Mother nor Father developed any insight into the problems that prevented them from being able to provide a safe and stable home for L.F. In fact, both parents continued to deny their respective issues. Accordingly, the juvenile court's finding that L.F. could not or should not be returned to either parent's home based on Mother's and Father's failures to remedy the conditions that precipitated the child's removal was supported by clear and convincing evidence and, therefore, not against the manifest weight of the evidence.

{¶32} The juvenile court's finding that an award of permanent custody of the child to CSB was in the child's best interest was also supported by clear and convincing evidence. L.F. was removed from his parents' home when he was seven years old. There is no evidence in the record that he lived anywhere but with Mother and Father prior to his removal, although there was a no contact order in effect as to Father when the child was removed. During the case, L.F. spent the first year in a foster home before being placed with paternal relatives. Unfortunately, that relative placement disrupted quickly and L.F. was placed in a second foster home where he remained for the duration of the case.

{¶33} L.F. struggles immensely with interaction and interrelationships with others. He has been diagnosed with attention-deficit/hyperactivity disorder, adjustment disorder with mixed disturbance of emotions and conduct, oppositional defiant disorder, and autism (moderate). He does not respect authority figures and does not relate easily to peers. The child is easily triggered to rage by anything and everything, including changes in his routine, questions about his inappropriate behavior, and even eye contact by others. When enraged, L.F. screams, throws himself on the ground, destroys property, and physically attacks others. He is not easily calmed by others and has not effectively integrated self-soothing techniques. Consequently, his interaction and interrelationships with others is volatile.

{¶34} L.F. has physically attacked other students and teachers. Shortly before the permanent custody hearing, he hit another foster child in the home with a heavy object, splitting that child's ear and necessitating multiple stitches. L.F. has consistently and vehemently refused to have any contact with Father throughout the case. He generally refuses to discuss Father except to say that "my dad is a drunk and beats up on my mom." Although the child never resisted visits with Mother, Mother stopped visiting the child after approximately five months.

More than a year later, Mother showed up late for a visit. Afterwards, the child's defiant and aggressive behaviors in the foster home escalated.

{¶35} Service providers have worked tirelessly to help the child learn to manage his rage and inappropriate behaviors with little to no effect. L.F. takes various medications to help stabilize his moods. The professionals who manage the child's medications have routinely modified types and amounts of medications and ordered blood tests to better determine which medications might work best. L.F.'s medication management will be an ongoing process. The child receives counseling in various settings where multiple techniques have been used to help him regulate his emotions and behaviors.

{¶36} In the school setting, gradated interventions have been utilized to help L.F. de-escalate when he becomes enraged. Initially, a "zones of regulations" program was implemented whereby the child was given activities in the hallway outside the classroom to distract him and de-escalate his aggression. The school next initiated a 504 Plan which gave the child more frequent breaks, extended time to complete tasks, and a safe area where he could attempt to implement calming strategies. When those strategies were not effective, the school created an Individualized Education Program for L.F. and moved him to a "self-contained" classroom, i.e., where the child stayed in one room with the same teacher all day instead of switching rooms for different subjects, for "emotionally disturbed" students. After seeing that the child's behavior worsened in the afternoon, the school shortened his day and released him after lunch. Abbreviated school days were short-lived, however, as the team of professionals working with the child determined that he needed more learning time.

{¶37} As a last resort from an educational standpoint, when L.F.'s classroom behaviors remained disruptive and violent, he was transferred to Manor, an alternative school environment

that focuses foremost on correcting behavior and secondarily on academics. Should that environment also not succeed in helping the child develop appropriate coping skills to manage his bouts of rage and learn to interact appropriately with peers and authority figures, the remaining option would be to transfer L.F. to a residential facility, effectively hospitalization rather than a learning environment. Given the child's young age, the caseworker and other professionals involved were loath to initiate such extreme measures unless they had no other choice.

{¶38} L.F. does not behave aggressively when he is in complete control of a situation. When unchallenged and not held accountable for his actions, he is not triggered to rage. L.F. did not behave inappropriately during his limited visits with Mother. In addition, his first foster mother reported no behavioral issues, although she admitted to the caseworker that she had no rules and allowed the child to do what he pleased.

{¶39} L.F. was nine years old at the time of the permanent custody hearing. Although the guardian ad litem attempted on various occasions to elicit the child's wishes regarding custody, he remained either unwilling or unable to convey his wishes to her. The guardian ad litem opined that it was in the child's best interest that he be placed in the permanent custody of CSB.

{¶40} After nearly two years in custodial limbo, with placements in two different foster homes and once with relatives, L.F. requires permanency. Neither Mother nor Father is a viable custodial option for the child.

{¶41} Mother's unaddressed mental health and substance abuse issues preclude her from being able to meet the child's basic and special needs and provide him with a safe and stable home environment. While often adamantly denying that she had used drugs notwithstanding

positive drug screens, she other times admitted that she struggles with sobriety. Mother testified that she had used drugs as recently as the week before the permanent custody hearing. She admitted that she keeps drugs and paraphernalia in the home where she lives but that everything is in "a box locked up," presumably where the child would not have access. Mother did not explain how she would shield the child from the effects of her drug use, however.

{¶42} Although Father was employed and had obtained housing, the child refused to have contact or any type of relationship with Father. When Father showed up unannounced at one of Mother's visits, the child would not talk to or even look at Father. L.F. was clear with the caseworker and guardian ad litem on the rare occasions that he would discuss Father that he wanted nothing to do with the man who would get drunk and beat his Mother. The child described to the caseworker the last incident of domestic violence he witnessed during which Father hit Mother in the head with a candle holder which cut her. The record indicates that during the six months prior to the agency's filing its complaint in this case, the police had been called to Mother's and Father's home at least eight times to address allegations of domestic violence.

{¶43} Despite the child's extreme repugnance towards Father based on Father's physical violence toward Mother, Father refused to recognize the impact that his actions had on the child's emotional and psychological well-being. Father denied committing domestic violence, telling the caseworker that he was merely trying to prevent Mother from using drugs. He explained that he pleaded guilty to his most recent domestic violence charge simply so he could resolve the criminal case and return to his job as quickly as possible. Instead of admitting that his actions had traumatized the child, Father told the caseworker that Mother filled the child's head with lies that caused him to distrust Father.

**{¶44}** Although Father attended two two-hour domestic violence classes, he demonstrated no insight. He failed to engage in anger management and alcohol abuse services, either of which might have helped him identify, understand, and address his issues. In the absence of any self-awareness regarding his use of violence and alcohol, as well as the impact of his behaviors on the child, Father is not able to provide a safe and nurturing environment for L.F.

**{¶45}** The child's current foster family has experience caring for children on the autism spectrum and with emotional issues. Although they had earlier expressed an interest in adopting L.F., they changed their minds after the child's recent and serious physical attack on another foster child in the home, coupled with the child's other ongoing extreme behaviors.

**{¶46}** The child's registered behavior technician from Youth Intensive Services and his school counselor both testified that any caregiver for L.F. must have a clear understanding of the child's multiple diagnoses which underlie his behavioral issues. In addition, his caregivers must be willing and able to provide a supportive and non-threatening environment for the child. Both parents' unaddressed and ongoing issues prevent either from providing such an environment for the child. Moreover, Mother and Father each have demonstrated a lack of insight regarding their own behaviors as well as the child's. Mother believes that the child does not act out, while Father believes that any behavioral issues stem from Mother's influence on the child, rather than any acts of violence witnessed by L.F.

**{¶47}** Based on a thorough review of the evidence, this is not the exceptional case wherein the trier of fact clearly lost its way and created a manifest miscarriage of justice by granting permanent custody of the child to CSB. The clear and convincing evidence supported the juvenile court's first-prong finding of the permanent custody test and demonstrated that the termination of Mother's and Father's rights was necessary in the best interest of the child.

Accordingly, the juvenile court's judgment awarding permanent custody of L.F. to CSB was not against the manifest weight of the evidence. Mother's sole and Father's first assignments of error are overruled.

## III.

**{¶48}** Mother's and Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

JENNIFER HENSAL
FOR THE COURT

CALLAHAN, J.
SUTTON, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

SHUBHRA N. AGARWAL, Attorney at Law, for Appellant.

ANGELINA GINGO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorey, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

SALLY PRENTICE, Guardian ad Litem.