[Cite as *In re A.G.*, 2024-Ohio-3091.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: A.G.
    E.G.

C.A. Nos.     30923
                  30924
                  30944
                  30945

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 22-03-288
               DN 22-03-289

DECISION AND JOURNAL ENTRY

Dated: August 14, 2024

HENSAL, Judge.

{¶1} Appellants Mother and Father appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed their twins in the permanent custody of Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2} Mother and Father are the biological parents of A.G. and E.G., both born on July 29, 2014. They also share an older daughter who was placed in the legal custody of a paternal relative in 2013, after CSB's intervention. Shortly after the twins' births, the agency again became involved with the family. The juvenile court awarded Father legal custody of A.G. and E.G. when they were still infants. Over the years, the girls lived with Father, his girlfriend ("Angie"), and

their disabled son. The twins knew nothing of Mother and believed that Angie was their biological mother. Although Mother obtained an order granting her visitation with the children in 2020, Father did not facilitate any contact between Mother and the girls.

{¶3} In 2021, CSB received a report that Father had physically abused A.G. and E.G. Father fled with the children, preventing the agency from investigating the report. In March 2022, CSB received another report of physical abuse by Father who hit all three children in his home. When Angie took her son to the hospital and refused to return, Father threatened to kill the twins. The police arrested Father and charged him with three counts of domestic violence and child endangering. CSB removed A.G. and E.G. from Father's home and filed complaints alleging they were abused, neglected, and dependent children. Father remained incarcerated throughout the duration of the cases, although he was at all times represented by counsel.

{¶4} Mother appeared at the shelter care hearing where she waived her hearing rights and stipulated to probable cause for the children's removal from their home and to the agency's use of reasonable efforts to prevent the removal. Father's absence and lack of stipulations necessitated the presentation of evidence by the agency. After learning that Mother had not had any contact with the children during the past seven years, the magistrate found that it would be in the children's best interest to reestablish a relationship with Mother in a therapeutic setting when the children's counselor deemed that appropriate. The magistrate placed A.G. and E.G. in the emergency temporary custody of CSB.

{¶5} At the adjudicatory hearing, Mother, and Father through counsel, waived their hearing rights and stipulated to findings that the twins were dependent and that the agency had continued to use reasonable efforts to prevent the children's continued removal from home. CSB withdrew its allegations of abuse and neglect.

{¶6} The parents again waived their rights to a dispositional hearing. Mother, and Father through counsel, stipulated to the agency's use of reasonable reunification efforts, an award of temporary custody to CSB, and adoption of the agency's case plan. Mother and Father each had substance abuse, mental health, parenting, and basic needs case plan objectives. The case plan indicated that both parents participated in its development and agreed with the objectives.

{¶7} Mother appeared at the first review hearing. At that time, Mother had not been involved in mental health counseling, only recently began a parenting assessment, and had refused all drug screens. The agency was concerned because Mother recently appeared to be intoxicated. Mother's visitation remained in the discretion of the caseworker and guardian ad litem. The magistrate again found that CSB had used reasonable efforts to prevent the children's continued removal from home.

{¶8} Mother filed a motion for legal custody, with or without protective supervision by CSB. After a hearing, the magistrate denied Mother's motion, finding that she had been "slow in working on her case plan objectives." Mother continued to refuse to submit to CSB's requests for drug screening, and the agency was unable to confirm Mother's allegations of sobriety. Mother did not have appropriate housing for the children, and CSB was concerned about the potential effect on the children's health in a home where the two adults therein smoked excessively. Mother appeared overwhelmed during supervised visits. The agency presented evidence of the children's "unusually rivalrous" relationship and their ongoing counseling to address their past trauma and reintroduction to a parent they did not know they had. The magistrate maintained the children in CSB's temporary custody and found that the agency had used reasonable reunification efforts.

{¶9} Ten months into the cases, CSB filed a motion for permanent custody. The guardian ad litem filed a report which supported the agency's motion. Shortly thereafter, the

guardian ad litem filed a notice of conflict, asking the juvenile court to appoint an attorney to represent the children because their wishes did not coincide with the guardian's recommendation. Specifically, both girls told the guardian ad litem that they wanted to "return home" to Angie whom they identified as "Mom." The guardian clarified that the children "have not expressed a wish to live with biological mother[.]" After a review hearing, the juvenile court appointed an attorney for A.G. and E.G., maintained them in CSB's temporary custody, and found that the agency had used reasonable efforts both to prevent the children's continued removal from home and to finalize a permanency plan.

{¶10} In response to CSB's motion for permanent custody, Mother filed a motion for legal custody, or alternatively, a six-month extension of temporary custody. Father filed a motion for a six-month extension of temporary custody. Shortly before the scheduled permanent custody hearing, both Mother's attorney and the children's attorney moved to withdraw. The juvenile court granted those motions, appointed alternate counsel for Mother, and continued the permanent custody hearing for more than four months.

{¶11} Mother filed a motion to expand her visitation. The guardian ad litem filed a report recommending no increase because A.G. had repeatedly said that she did not want to visit with Mother, while E.G. was "fairly neutral" regarding visits. After a hearing, the juvenile court ordered that the agency, in its discretion and in consultation with the guardian ad litem, could increase the duration of Mother's visits and decrease the level of supervision. The trial court also left open the possibility of home visits if CSB approved Mother's home and a parenting coach from The Bair Foundation attended the visits.

{¶12} Shortly before the permanent custody hearing, the guardian ad litem again filed a notice of conflict and requested the appointment of counsel for the children because one of the

girls' wishes conflicted with the guardian's recommendation for permanent custody. The trial court reappointed counsel for the children. During preliminary discussions at the permanent custody hearing, the children's attorney informed the court that she had spoken with the twins and determined that there was no conflict between their wishes and the recommendation of the guardian ad litem. Accordingly, she moved to withdraw. The attorney added that the children's current wishes are consistent with their wishes at the time the attorney moved to withdraw the first time.

{¶13} The guardian ad litem clarified that the initial conflict arose because the children desired to reunify with Angie. Because Angie was not willing to accept placement or custody of the children, the conflict resolved. The guardian reported that the girls continue to name Angie as their first choice of legal custodian, while consistently naming their foster mother as their second choice. However, because E.G. one day said she wanted to live with Mother because the foster mother was "mean," the guardian ad litem felt compelled to file a notice of conflict. The guardian ad litem emphasized that this was a one-time expression by E.G. who had not expressed any further desire to live with Mother during the past six months. Mother's attorney informed the juvenile court that the children's counseling records indicate that the girls have wanted to live in various places but that the records contained no information different from what the guardian ad litem just stated.

{¶14} The juvenile court found that there was no conflict requiring the ongoing appointment of counsel for the children and excused the attorney from further representation before the parties began presenting evidence. No party objected to the withdrawal by the children's attorney.

{¶15} The matter proceeded to a hearing on CSB's motion for permanent custody, and Mother's alternative motions for legal custody or a six-month extension of temporary custody. Father's attorney asserted that, because Father would remain in prison until mid-2026 and was not available to seek legal custody, Father supported Mother's motions to preserve his parental rights. After the hearing, the juvenile court issued its judgment denying Mother's alternative motions, granting CSB's motion for permanent custody, and terminating Mother's and Father's parental rights. The parents each timely appealed. Mother raises four assignments of error for consideration, while Father raises two. This Court consolidates some assignments of error to facilitate review.

II.

### MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ALSO WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN GRANTING THE MOTION FOR PERMANENT CUSTODY AND NOT GRANTING [MOTHER] CUSTODY.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ALSO WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN GRANTING THE MOTION FOR PERMANENT CUSTODY AND NOT GRANTING [MOTHER] A SIX-MONTH EXTENSION.

### FATHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT FOUND IT WAS IN THE BEST INTEREST OF THE CHILDREN TO GRANT PERMANENT CUSTODY TO [CSB] BECAUSE THAT DECISION WAS NOT IN THE BEST INTEREST OF THE CHILD[REN], AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

## FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT FOUND THE FIRST PRONG OF THE PERMANENT CUSTODY TEST WAS MET UNDER [REVISED CODE SECTION] 2151.414(E)(1) BECAUSE MOTHER HAD SUBSTANTIALLY REMEDIED THE CONDITIONS CAUSING THE CHILDREN TO BE PLACED OUTSIDE HER HOME.

{¶16} Mother and Father argue that the juvenile court's judgment is against the manifest weight of the evidence. This Court disagrees.

{¶17} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶18} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under Revised Code Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial

history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in Section 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

First prong considerations

{¶19} As to the first prong of the permanent custody test, CSB alleged pursuant to Section 2151.414(B)(1)(a) that the children could not be placed with either parent within a reasonable time or should not be placed with either parent in consideration of various subsection (E) grounds. As to Father, those grounds related to the nature of his convictions and duration of his prison sentence. R.C. 2151.414(E)(5), (6), and (12). The juvenile court found that the agency proved those allegations by clear and convincing evidence. Father does not challenge those findings.

{¶20} As to Mother, CSB alleged that she had failed to remedy the concerns underlying the children's removal from home under Section 2151.414(E)(1). That section provides in full:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶21} CSB and both parents jointly created a case plan with objectives designed to facilitate reunification of the children with either parent. The juvenile court adopted the agency's

case plan as an order after both parents stipulated to its adoption at the initial dispositional hearing. Mother's general objectives related to substance abuse, mental health, parenting, and basic needs. Each objective included multiple specific requirements.

Substance abuse

{¶22}  Mother's substance abuse objective required her to submit to random drug screens.  If positive, she had to obtain a substance abuse assessment, follow all recommendations, maintain a network to encourage and support her sobriety, and sign all necessary releases of information.

{¶23}  Mother consistently refused to submit to CSB's requests for drug screens from June 2022 until December 2022.  In December 2022, she tested positive for methamphetamine and amphetamines.  Mother reported that she was receiving drug treatment at Phoenix Rising Behavioral Healthcare and Recovery ("Phoenix"), but when the caseworker contacted that agency, she learned that Mother was not addressing her substance abuse issues there.  Accordingly, the caseworker made a referral for a drug use assessment for Mother at Community Health Center Addiction Services ("CHC").  Mother did not engage with CHC until April 2023.  From that time until the permanent custody hearing in November 2023, Mother consistently participated in treatment to address her diagnosis of amphetamine use disorder, severe.  All her drug screens at CHC were negative for all substances.  Although Mother testified that she did not know her sobriety date, her consistent negative random drug screens and participation in treatment services satisfied CSB that Mother had satisfied her substance abuse case plan objective.

Mental health

{¶24}  Mother's mental health case plan objective required her to obtain a mental health assessment; follow all recommendations; sign any necessary releases of information; and

demonstrate an understanding of her mental health issues, develop coping skills, and engage in healthy relationships with others, including A.G. and E.G. Mother's therapist at CHC testified that, while Mother completed a mental health assessment as part of her intake, it was based on self-reporting and yielded a diagnosis of generalized anxiety disorder. The caseworker testified that Mother's prior cases with the agency evidenced that Mother had reported taking medication for diagnosed bipolar disorder, posttraumatic stress disorder, anxiety, and depression. Although Mother now disputes that she was diagnosed with bipolar disorder, the certified records of the prior juvenile cases involving her four children reference that diagnosis in the complaints. Mother stipulated both to those allegations in the prior complaints and to the admission of those prior juvenile records in these cases.

{¶25} Because Mother informed her therapist at CHC that she was receiving mental health services at Summa, the therapist focused on Mother's substance abuse issues. The therapist testified that she did not review any records from Summa. In addition, the CSB caseworker testified that Summa never sent any records regarding Mother's alleged services to the agency despite repeated requests.

{¶26} Mother ultimately confessed to the CHC therapist that she was no longer involved in mental health counseling at Summa. The therapist testified she believes that Mother requires additional services to address her mental health concerns, particularly as the therapist did not address those concerns as she normally would have, had she known Mother was not engaging in services elsewhere.

{¶27} The caseworker testified that Mother was working on her mental health issues at the beginning of the case at Phoenix, but Mother's participation there was sporadic. Phoenix discharged Mother from their agency based on missed appointments and non-compliance with

services. Mother then told the caseworker that she was receiving mental health medications from Summa while engaging in mental health counseling at CHC. However, CHC was only focusing on Mother's substance abuse issues.

{¶28} The caseworker referred Mother to The Bair Foundation ("Bair") for mental health counseling where she engaged for a "very, very short amount of time." Mother resisted participating in mental health services, adamantly asserting that she did not have any issues. The caseworker testified, however, that Mother struggled to manage her emotions throughout the case. She often exhibited a flat affect during interactions with service providers and the children. Alternatively, her reflected emotions did not correspond to the nature of conversations or interactions. Both the caseworker and guardian ad litem expressed concern that stressful circumstances, including when the children became aggressive toward each other or hurtful toward Mother, caused Mother to shut down and stare off into space. She became unresponsive to the children's questions and requests for engagement in activities.

{¶29} The guardian ad litem testified that Mother has responded at times appropriately, and at other times disproportionately, to the children's various maladaptive behaviors. She characterized Mother's behaviors as "erratic and unpredictable." The caseworker emphasized that Mother lacked an awareness of the mental health issues that interfered with her ability to relate in a healthy way to the children. Both the caseworker and guardian ad litem testified that Mother made minimal effort or progress in addressing her mental health case plan objective.

Parenting

{¶30} The case plan required Mother to enroll in weekly parenting classes. The caseworker made a separate referral for Mother to participate in Bair's two-part parenting program. The first part consisted of classroom lessons. Mother engaged in some of those. The second phase

involved hands-on practical skills lessons under the direction of a parenting coach. Mother did not engage in any one-on-one sessions.

{¶31}  During visits, Mother struggled to manage the children's emotions and behaviors. The guardian ad litem and caseworker described the visits as chaotic. Both noted that the girls take charge during visits and often scold Mother for her behavior. The caseworker, visitation supervisor, and guardian ad litem each described instances where Mother failed to intervene when the girls verbally instigated one another or engaged in physical altercations. The caseworker and guardian ad litem expressed concern that, instead of mirroring the interactions they had with the children or following their suggestions for actions Mother might take when the children began to fight, Mother withdrew into herself and became unresponsive to the children, leaving other professionals to separate the girls and calm them down.

{¶32}  The caseworker testified that Mother had been unable to establish boundaries and expectations for the children. At one point, Mother attempted to use a "coupon" system to reward the girls for positive behavior. The caseworker testified, however, that Mother simply gave the coupons to the children irrespective of their behavior, instead of using them to reinforce good behavior or clearly convey expectations for earning them. More troubling was that the coupons were for rewards that Mother could not provide. Rather, they would have required the foster mother to provide the reward Mother chose, such as allowing the child to choose a restaurant for dinner that evening.

{¶33}  Mother consistently attended her visits with the children. The children's interest in visiting varied. A.G. explicitly expressed her desire to cease visits with Mother for several months. She perceived that Mother favored E.G., bringing that child gifts that A.G. did not receive. Both children frequently made unkind comments to Mother. The caseworker and visitation aide had to

intervene. Instead of addressing those issues with the girls and setting boundaries, Mother blamed CSB for putting disrespectful ideas about her in the children's minds. Overall, Mother failed to demonstrate the parenting skills necessary to manage visits and establish a healthy parent-child relationship with the girls. The caseworker testified that Mother showed no improvement in her parenting abilities in over a year.

Basic needs

{¶34} Mother's basic needs case plan objective required her to obtain a source of income for food, housing, and other needs of the children; develop a budget to provide for those necessities; maintain a home free from hazards; and allow CSB access to the home for assessments. Mother worked sporadically throughout the duration of these cases. At the time of the hearing, she was working at a pizza restaurant but also planning to seek full-time employment elsewhere. She testified that she planned to work third shift and would rely on the children's maternal grandmother for childcare while Mother worked two jobs, even though the caseworker described Mother's relationship with her mother as rocky.

{¶35} At all times during the cases, Mother lived with her father in his home. The maternal grandfather paid for rent, utilities, and food. Mother admitted that she frequently did not have funds to contribute to household expenses. The caseworker and guardian ad litem testified that the home is smoke-laden and smells heavily of cigarettes. Mother appeared agitated in the home because the maternal grandfather was very particular about his possessions and did not want anyone to touch anything. The children have experienced severe trauma throughout their lives, and that manifests in large part as a lack of boundaries. The guardian ad litem was concerned that children who routinely violate the personal space of others would have difficulty living in a space where they were not allowed to touch items in the home. The caseworker and guardian ad litem

had no success communicating with the maternal grandfather during these cases. The caseworker testified that Mother consistently made excuses as to why the caseworker could not speak with the grandfather.

{¶36} Mother wavered between admitting that her current home was not appropriate for the children and asserting that it was a safe and stable environment. She admitted that her father is demeaning to her and not supportive of her reunification efforts. The home has two bedrooms, so the nine-year-old girls would have to share a bedroom with Mother. Mother obtained a subsidized housing voucher many months earlier and testified that she looked at and rejected over 30 apartments. At the time of the hearing, Mother was not capable of meeting her own basic needs and could not assume responsibility for providing for the needs of the children.

First prong conclusion

{¶37} Based on a thorough review of the evidence, this Court concludes that the juvenile court's finding that Mother failed to remedy the conditions underlying the agency's removal of the children is not against the manifest weight of the evidence. While Mother substantially complied with her substance abuse objective and did an admirable job of attaining and maintaining sobriety for an extended period of time, she did not address her other core objectives in a meaningful way.

{¶38} Mother failed to acknowledge the impact of her long-term mental health issues on her ability to develop a healthy relationship with the children. She did not engage in mental health services with any consistency. While she took advantage of her opportunities to visit with the children, she was unable to demonstrate an understanding of their trauma-based issues and behavioral problems. Mother could not effectively manage the children during visits, frequently withdrawing and relying on others to address the girls' physical altercations. She lacked a stable source of income, working short periods at a variety of fast-food restaurants. Mother relied on the

maternal grandfather for housing. At that home, the air is heavy with cigarette smoke and there is no bedroom for the children. The grandfather is possessive of his belongings, resulting in Mother becoming agitated when the caseworker or guardian ad litem touched anything. Mother admitted that her father was not supportive of her desire to reunify with the children. Nevertheless, although she had obtained a housing voucher many months earlier, Mother had not secured independent housing. As the clear and convincing evidence showed that Mother had not addressed several significant concerns that prevented her from being able to provide a safe and stable home for the children, the juvenile court's first-prong finding is not against the manifest weight of the evidence.

Best interest of the children

Custodial history

{¶39} Shortly after the twins' births in 2014, CSB removed the girls from their parents' home and filed complaints alleging their dependency based in part on Mother's failure to provide care for the infants and indications of mental health issues. The juvenile court adjudicated the children dependent. In 2015, the juvenile court placed A.G. and E.G. in Father's legal custody, where they remained until the agency initiated the instant cases in March 2022. During the intervening years, Mother had no contact with the girls who believed that Angie was their biological mother.

Interaction and interrelationships of the children

{¶40} A.G. and E.G. have no contact with Father who is in prison for offenses of violence committed against the children. The girls have had some limited contact with Angie since their removal, although only when the children have initiated it. Although Angie raised the girls as her own children for almost seven years, she did not pursue placement and consistently informed CSB that she does not want to be considered for legal custody.

{¶41} The girls have a very contentious relationship with each other, surpassing typical manifestations of sibling rivalry. They instigate one another and are prone to physical altercations. They have engaged in counseling from the beginning of the cases to address the trauma they experienced as a result of the violence in Father's home. The guardian ad litem reported that the girls' physical aggressions have waned in frequency but not intensity. It is not unusual that a third party must intervene to physically separate the girls during fights.

{¶42} The juvenile court gave Mother the opportunity to visit with the children from the beginning of the case, as long as the initial visits took place in a therapeutic setting, given that the girls had never met Mother. The girls were in counseling at Bair, and the trial court approved Bair to oversee the visits. Mother did not immediately contact Bair so there was some delay in initiating visits.

{¶43} Mother has struggled to develop a relationship with the girls. She has not attempted to break up the children's physical altercations and was unable to redirect them when they misbehaved. While she has on occasion told the girls to separate and go to different locations, the children do not obey her. Mother brings appropriate activities for the children at visits, but the girls rarely engage in those activities together without incident. It is not uncommon for one child or the other to leave the area during visits. A child left the building on at least one occasion. A.G. and E.G. frequently scold or criticize Mother. Instead of addressing that situation with the children, Mother blames CSB or the foster mother for putting such ideas in the children's minds. Both the caseworker and guardian ad litem testified that the children take control of visits and disregard Mother's input.

{¶44} On the other hand, A.G. and E.G. are comfortable with the foster mother with whom they have lived for the duration of the cases. The foster mother sets boundaries and expectations

for the children who respect and obey her. Moreover, the children behave well in school and respect the authority figures in that environment.

Wishes of the children

{¶45} Both the guardian ad litem and caseworker testified that the children consistently throughout the cases expressed their desires to live with Angie or the foster mother. On one occasion more than six months before the permanent custody hearing, after E.G. got in trouble in the foster home, she told the guardian ad litem that she wanted to live with Mother because the foster mother was "mean." She never expressed that desire again. A.G. never asserted that she wanted to live with Mother.

{¶46} The guardian ad litem opined that an award of permanent custody would be in the children's best interest. Although she advocated from the beginning of the cases for Mother's opportunity to develop a parent-child relationship with the girls, the guardian ad litem testified that, based on her observations, she did not believe that Mother could appropriately parent the children. She was concerned that Mother has never acknowledged the children's maladaptive behaviors or needs and has not been able to manage the children during visits. The guardian ad litem emphasized that Mother's behavior can be "erratic and unpredictable," while the children require consistency, clear boundaries and expectations, and the use of appropriate consequences. Mother never participated in hands-on parenting instruction, but the guardian ad litem testified that even if she had, that would not cure Mother's inability to provide a safe and stable home because of her ongoing basic needs and mental health issues.

Children's need for a legally secure permanent placement

{¶47} The children were nine years old and had been in agency custody for almost 20 months at the time of the permanent custody hearing. They deserved a safe, stable, and appropriate

home with a caregiver who could meet their basic needs and ensure that they continue to address their trauma-related mental health issues. The foster mother, who was their sole caregiver during the cases, reinforced the coping strategies and behavioral insights the girls worked on during their counseling sessions with a Bair therapist. The foster mother was willing to adopt the children and continue to provide an appropriate home for them. She also allowed the girls to communicate with Angie when they desired.

{¶48} Mother made great strides in addressing her substance abuse issues. Unfortunately, she disputed that she had mental health issues despite the agency's historical knowledge of Mother's long-standing diagnoses. Mother reported to her substance abuse therapist that she was receiving mental health services at Summa when she was not. Mother eventually admitted to her CHC therapist that she was not addressing mental health issues at Summa. The CHC therapist focused her efforts on Mother's substance abuse issues and testified that Mother needed to address the remainder of her mental health wellness with greater emphasis.

{¶49} Mother was additionally unprepared to meet the children's basic needs or parent the girls appropriately. Mother's income was inconsistent. Her current home she shared with her father was hazy with cigarette smoke, lacked a bedroom for the children, and was a restrictive environment where the girls would not be allowed to touch the grandfather's possessions in the home. According to their therapist, both girls are impulsive and lack boundaries, so refraining from touching the maternal grandfather's furniture and other items in the home would require Herculean effort on their part, and patience, support, and appropriate guidance by Mother and their grandfather. Mother admitted that her father was not supportive of her desire for reunification with the children. She asserted that he was demeaning to her. Moreover, Mother consistently

exhibited the inability to address conflict during visits, instead withdrawing and refusing to interact with the children.

Best interest conclusion

{¶50} After reviewing the evidence, this Court concludes that this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice in determining that it was in the best interest of the children to grant permanent custody to CSB. The children had no relationship with Mother until these cases began when the girls were almost eight years old. Mother did not begin to work on any case plan objectives for ten months after the juvenile court adopted the case plan as an order. She attained sustained sobriety but did not engage in mental health services, instead insisting that she did not have any issues. The professionals involved in the cases observed that Mother's behaviors remained erratic and unpredictable. She deflected responsibility for her behavior and did not demonstrate appropriate coping skills when dealing with the challenges of the children's behavior. Instead, Mother withdrew, became unresponsive, and ultimately blamed others for the difficulties she faced with the children.

{¶51} Despite obtaining a housing voucher, Mother failed to secure appropriate housing for the children. The home she shares with the maternal grandfather has no bedroom for the girls and they would be subjected to excessive secondhand smoke on a consistent basis there. Mother interfered with the efforts of the caseworker and guardian ad litem to speak with the grandfather to determine whether he would help Mother provide a suitable environment for the children. Mother admitted, however, that her father was not supportive of her efforts to reunify with the girls, that he got angry when she moved anything in the home, and that he was demeaning to her. Mother admitted that she was often unable to contribute financially to the household, so it was

unclear how she might have been able to provide for the children's basic needs even if she had independent housing.

{¶52} The children require ongoing counseling to address their significant trauma-related mental health issues and maladaptive behaviors. Mother never demonstrated an understanding of the girls' issues, instead blaming others for encouraging the children to say unkind things to her. Mother failed to establish rules, boundaries, or consequences for the children. She was generally unresponsive when the girls fought and harmed one another.

{¶53} In consideration of the above evidence, this Court concludes that CSB presented clear and convincing evidence that an award of permanent custody was in the best interest of the children. Accordingly, the juvenile court's judgment is not against the manifest weight of the evidence.

Six-month extension of temporary custody

{¶54} Mother further argues that the juvenile court erred by failing to grant a six-month extension of temporary custody because she had substantially complied with her case plan objectives. To justify an extension of temporary custody, Section 2151.415(D) requires clear and convincing evidence not only that the parent has made substantial progress toward reunification through case plan compliance, but also that the extension is in the best interest of the children and there is reasonable cause to believe that reunification will occur with the period of extension. This Court has long recognized that "where an award of permanent custody is in the child's best interest, a six-month extension of temporary custody necessarily is not." *In re L.T.*, 2022-Ohio-114, ¶ 33 (9th Dist.), citing *In re A.S.*, 2017-Ohio-8984, ¶ 31 (9th Dist.).

{¶55} As discussed above, Mother failed to make the requisite case plan progress to warrant an extension. We further concluded that an award of permanent custody is in the children's

best interest. Moreover, the caseworker testified that reunification within any period of extension was unlikely because Mother refuses to acknowledge her own mental health struggles and the children's behavioral issues. The caseworker emphasized that, in well over a year of having the opportunity to participate in case plan services, Mother's relationship and interactions with the children had not improved. Accordingly, the juvenile court did not err by denying Mother's request for a six-month extension of temporary custody.

{¶56} For the above reasons, Mother's and Father's first and second assignments of error are overruled.

### MOTHER'S ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED THE PARENTS' RIGHTS AND PLACED THE CHILDREN IN THE PERMANENT CUSTODY OF [CSB] WHEN THE AGENCY DID NOT PROVIDE [MOTHER] WITH REASONABLE REUNIFICATION EFFORTS[.]

{¶57} Mother argues that the juvenile court erred by awarding permanent custody of the children to CSB when the agency failed to make reasonable reunification efforts. This Court disagrees.

{¶58} Section 2151.419(A)(1) requires the juvenile court to determine whether the agency has used reasonable reunification efforts at any hearing at which the court removes children from their home or continues the children's removal from their home. It is well settled that "the statute imposes no requirement for such a determination at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing." (Internal quotations omitted.) *In re L.R.*, 2019-Ohio-2305, ¶ 14 (9th Dist.), quoting *In re A.C.-B.*, 2017-Ohio-374, ¶ 22 (9th Dist.); *see also In re C.F.*, 2007-Ohio-1104, ¶ 41-43 (concluding that a

reasonable efforts determination is necessary at a permanent custody hearing only if the agency has not demonstrated its use of reasonable efforts prior to that time).

{¶59} In this case, the juvenile court consistently found that CSB had used reasonable efforts to prevent the children's removal from their home. Beginning with the shelter care hearing and continuing with adjudication, the initial disposition, and multiple review hearings, the trial court made the requisite statutory reasonable efforts determinations. At no time did Mother or any other party challenge those findings. Moreover, Mother stipulated at several hearings that the agency had used reasonable efforts. She also jointly developed the case plan with CSB.

{¶60} As Mother failed to challenge any reasonable efforts determinations by the juvenile court, she has forfeited any challenge to the agency's use of reasonable efforts on appeal except for a claim of plain error. *See In re L.R.* at ¶ 18. To demonstrate plain error, Mother must show not only trial court error, but also resulting prejudice. *In re T.G.*, 2020-Ohio-4802, ¶ 22 (9th Dist.). As Mother has not provided any transcripts of the prior hearings after which the juvenile court consistently found CSB's use of reasonable efforts, this Court must presume regularity as to those reasonable efforts determinations. *See In re L.R.* at ¶ 18. Accordingly, Mother has failed to demonstrate error by the juvenile court necessary to substantiate plain error. Mother's third assignment of error is overruled.

## MOTHER'S ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED PLAIN ERROR AND REVERSIBLE ERROR WHEN IT DID NOT CONTINUE THE APPOINTMENT OF AN ATTORNEY FOR THE CHILDREN AFTER THE CHILDREN "ENJOYED" VISITS AND EXPRESSED INTEREST IN VISITS.

{¶61} Mother argues that the juvenile court erred by allowing the children's attorney to withdraw at the beginning of the permanent custody hearing because the children had expressed an interest in visiting with Mother. This Court disagrees.

{¶62} "'[T]he Ohio Supreme Court [has] held that a child who is the subject of a juvenile court proceeding to terminate parental rights may be entitled to independent counsel where the child's guardian ad litem recommends a disposition that conflicts with the child's wishes.'" *In re L.F.*, 2021-Ohio-3431, ¶ 17 (9th Dist.), quoting *In re J.P.-M.*, 2007-Ohio-5412, ¶ 53 (9th Dist.), citing *In re Williams*, 2004-Ohio-1500, syllabus and ¶ 18. Moreover, "'[w]here there is an affirmative demonstration of a conflict between the views of the [ ] guardian ad litem and the wishes of the child[ ], the trial court is obligated to appoint independent legal counsel to represent the child[ ].'" *In re L.F.* at ¶ 18, quoting *In re K.H.*, 2005-Ohio-6323, ¶ 38 (9th Dist.). To find the requisite conflict, however, "'the record must demonstrate that the child has repeatedly and consistently expressed the affirmative desire to return to the parent's home.'" *In re L.F.* at ¶ 18, quoting *In re B.W.*, 2012-Ohio-3416, ¶ 42 (9th Dist.).

{¶63} In this case, the guardian ad litem filed a notice of conflict after E.G. stated on one occasion that she wanted to live with Mother because the foster mother was "mean." The guardian ad litem testified that E.G. never again expressed the desire to live with Mother. A.G. never stated that she wanted the trial court to grant legal custody to Mother. Accordingly, the girls did not "repeatedly and consistently express[ ] the affirmative desire to return to [Mother's] home." *See In re L.F.* at ¶ 18. At most, the children on rare occasions indicated that they enjoyed visiting with Mother. More frequently, the children were neutral about their visits with Mother, while A.G. adamantly wanted to stop visits at various times because she perceived that Mother showed favoritism to E.G. Even assuming the girls had grown to enjoy visiting with Mother, that did not rise to the level of desiring to be placed in her legal custody. In fact, the guardian ad litem testified that A.G. and E.G. consistently indicated throughout the cases their desires to either return to Angie's home or remain with the foster mother.

**{¶64}** In addition, Mother's attorney agreed that the guardian ad litem accurately reported the children's wishes throughout the cases. When the juvenile court excused the children's attorney from further representation, Mother did not object. She, therefore, forfeited her ability to challenge the issue, save for a claim of plain error. *In re S.S.*, 2023-Ohio-245, ¶ 40. While she argues that dismissal of the children's attorney impacted the "basic fairness and integrity of the proceedings" because the girls' "wishes were simply not represented throughout the course of trial[,]" she admitted that the guardian ad litem in fact accurately reported the children's wishes regarding both custody and visitation. Mother's fourth assignment of error is overruled.

## III.

**{¶65}** Father's two and Mother's four assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

JENNIFER HENSAL
FOR THE COURT

SUTTON, P. J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

ANGELINA GINGO, Attorney at Law, for Appellant.

JAYSEN W. MERCER, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and AARON B. CAMPBELL, Assistant Prosecuting Attorney, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.